**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE LUIS MUNOZ SANTOS, *Petitioner-Appellant*, | No. 12-56506 |
| v. | D.C. No. 2:11-cv-06330-MMM |
| LINDA R. THOMAS, Warden, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted En Banc January 12, 2016
Pasadena, California

Filed July 28, 2016

Before: Sidney R. Thomas, Chief Judge and M. Margaret
McKeown, Kim McLane Wardlaw, William A. Fletcher,
Richard R. Clifton, Jay S. Bybee, Consuelo M. Callahan,
Milan D. Smith, Jr., Sandra S. Ikuta, Mary H. Murguia and
John B. Owens, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Callahan

## SUMMARY[*]

### Habeas Corpus / Extradition

The en banc court reversed the district court's judgment denying habeas relief from a magistrate judge's order certifying Jose Luis Munoz Santos's extradition to Mexico on kidnapping charges, and remanded, in a case in which Munoz sought to introduce evidence that incriminating statements made against him by his co-conspirators were obtained by torture and therefore could not support the probable cause required to expedite.

The en banc court held that the co-conspirators' claims that their prior statements implicating themselves and Munoz were obtained under duress are not contradictory, but explanatory, because they go to the competence of the government's evidence, and may therefore be considered by the extradition court.

The en banc court concluded that it could not resolve on the record before it whether, assuming arguendo that the co-conspirators' confessions must be excluded, there is sufficient evidence of probable cause to affirm. The en banc court remanded for the district court to return the case to the extradition court for further proceedings to address the competency and the sufficiency of the government's evidence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Dissenting, Judge Callahan, joined by Judge Ikuta, wrote that the majority reviews the extradition court's decision for technical error, exceeding the scope of judicial review under well-established Supreme Court precedent; risks converting a probable cause hearing into a mini-trial with all the evidentiary trappings, contrary to Supreme Court precedent; and puts to test on American soil the reliability of the foreign nation's evidence, which is an assessment that the governing treaty reserves for Mexican judicial authorities.

## COUNSEL

Matthew B. Larsen (argued), Deputy Federal Public Defender; Hilary L. Potashner, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

Mark R. Yohalem (argued) and Aron Ketchel, Assistant United States Attorneys; Robert E. Dugdale, Chief, Criminal Division; Eileen M. Decker, United States Attorney; United States Attorney's Office, Los Angeles, California; for Respondent-Appellee.

Jennifer Pasquarella, ACLU Foundation of Southern California, Los Angeles, California; Steven M. Watt, Human Rights Program, ACLU Foundation, New York, New York; Melissa Hooper, Human Rights First, New York, New York; Baher Azmy, Center For Constitutional Rights, New York, New York; for Amici Curiae the American Civil Liberties Union, American Civil Liberties Union of Southern California, Human Rights First, and Human Rights Watch.

William J. Aceves, California Western School of Law, San Diego, California; Robert E. Kohn, Kohn Law Group, Santa Monica, California; for Amicus Curiae Juan E. Méndez, United Nations Special Rapporteur on Torture.

**OPINION**

BYBEE, Circuit Judge:

Jose Luis Munoz Santos ("Munoz"), appeals the district court's denial of habeas relief from a magistrate judge's order certifying Munoz's extradition to Mexico on charges of kidnapping.[1]  In his extradition hearing, Munoz sought to

---

[1] We note that the extradition court's opinion was originally reported as *In re Extradition of Santos*, 795 F. Supp. 2d 966 (C.D. Cal. 2011), and that the panel's opinion was reported as *Santos v. Thomas*, 779 F.3d 1021 (9th Cir. 2015).  This is incorrect.  "Many Spanish names are composed of both the father's and the mother's family names, usually in that order, sometimes joined by *y* (and). . . . [P]ersons with such names are usually referred to by both family names but sometimes by only one (usually, but not always, the first of the two family names), according to their own preference.  It is never incorrect to use both."  Chicago Manual of Style ¶ 8.11 (16th ed. 2010); *see also United States v. Benitez*, 34 F.3d 1489, 1497 n.7 (9th Cir. 1994) (discussing Hispanic naming conventions and citing the Chicago Manual).  By way of example, Colombian Nobel Laureate Gabriel García Márquez may be referred to as "García" or "García Márquez," but generally not as "Márquez," which is his mother's maiden name.  In his briefs, Munoz refers to himself as "Munoz," not "Santos"; thus, this case is properly captioned as either *Munoz v. Thomas* or *Munoz Santos v. Thomas*.  Ironically, the extradition court notes this naming convention in its opinion regarding Munoz's release on bail—and still proceeds to refer to Munoz as "Santos."  *In re Extradition of Munoz Santos*, 473 F. Supp. 2d 1030, 1042 (C.D. Cal. 2006).

This naming convention appears to have caused a great deal of confusion among American courts generally.  The Bluebook's guidance on this issue is unclear, noting that "if a party's name is of Spanish or Portuguese derivation, cite the surname and all names following," but without clarifying how a court is to determine what a person's surname actually is.  The Bluebook: A Uniform System of Citation Rule 10.2.1(g), at 100 (Columbia Law Review Ass'n et al. eds., 20th ed. 2015).  Likewise, legal research databases frequently get this wrong.

introduce evidence that incriminating statements made against him by his co-conspirators were obtained by torture, and therefore could not support the probable cause required to extradite.  The extradition court concluded that the evidence of coercion was not admissible in the extradition hearing, because the allegations were contained in statements in which the witnesses had recanted their previous incriminating statements.  The court concluded that this rendered the allegations "contradictory" evidence—as opposed to "explanatory" evidence—and the allegations were therefore inadmissible in an extradition proceeding.  *See Collins v. Loisel*, 259 U.S. 309, 316–17 (1922).  The district court denied Munoz's habeas petition, and a panel of this court affirmed, relying in part on our decision in *Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005) (en banc) (per curiam).  We took this case en banc to determine the admissibility in an extradition hearing of evidence suggesting that other evidence presented in the hearing was obtained through coercion or torture.

We hold that evidence of coercion is explanatory, and may be considered by the extradition court, even if the evidence includes a recantation.  We reverse the judgment of the district court, and we remand to the district court to issue the writ of habeas corpus unless the extradition court certifies Munoz's extraditability after proceedings consistent with this opinion.

---

In the interest of allaying this confusion—and avoiding unintended consequences—we provide this explanatory note as guidance for ourselves and the lower courts.

## I.  THE EXTRADITION PROCESS

The procedural history of this case will be easier to navigate with an overview of the extradition process in mind. Extradition law is based on a combination of treaty law, federal statutes, and judicial doctrines dating back to the late nineteenth century.  *See* 18 U.S.C. §§ 3181–96; *see also* Ronald J. Hedges, International Extradition: A Guide for Judges 1 n.3 (Federal Judicial Center 2014) ("FJC Manual") ("The law of extradition in the United States is well established, dating back to the late nineteenth and early twentieth centuries.").

Authority over the extradition process is shared between the executive and judicial branches.  The process begins when the foreign state seeking extradition makes a request directly to the U.S. Department of State.  If the State Department determines that the request falls within the governing extradition treaty, a U.S. Attorney files a complaint in federal district court indicating an intent to extradite and seeking a provisional warrant for the person sought.  *See Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006); *see also* 18 U.S.C. § 3184.  Once the warrant is issued, the district court, which may include a magistrate judge, conducts a hearing to determine "whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' or, in other words, whether there is probable cause."  *Vo*, 447 F.3d at 1237 (quoting in part 18 U.S.C. § 3184).

The Supreme Court has described these extradition hearings to determine probable cause as akin to a grand jury investigation or a preliminary hearing under Federal Rule of Criminal Procedure 5.1. *See, e.g.*, *Charlton v. Kelly*, 229 U.S.

447, 461–62 (1913); *Benson v. McMahon*, 127 U.S. 457, 463 (1888); FJC Manual at 10.  As the First Circuit described the process:

> In probable cause hearings under American law, the evidence taken need not meet the standards for admissibility at trial. Indeed, at a preliminary hearing in federal court a "finding of probable cause may be based upon hearsay in whole or in part." Fed. R. Crim. P. 5.1(a).  This is because a preliminary hearing is not a minitrial of the issue of guilt; rather, its function is the more limited one of determining whether probable cause exists to hold the accused for trial.  An extradition hearing similarly involves a preliminary examination of the evidence and is not a trial.

*United States v. Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997) (citations omitted).  We have said that the extradition court's review is limited to determining, first, whether the crime of which the person is accused is extraditable, that is, whether it falls within the terms of the extradition treaty between the United States and the requesting state, and second, whether there is probable cause to believe the person committed the crime charged. *See, e.g.*, *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000), *overruled on other grounds by Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc); *see also Zanazanian  v. United States*, 729 F.2d 624, 625–26 (9th Cir. 1984) (describing the inquiry as "whether: [1] the extradition judge had jurisdiction to conduct proceedings; [2] the extradition court had jurisdiction over the fugitive; [3] the extradition treaty was in full force

and effect; [4] the crime fell within the terms of the treaty; and [5] there was competent legal evidence to support a finding of extraditability").

Foreign states requesting extradition are not required to litigate their criminal cases in American courts. Accordingly, the scope of the extradition court's review "is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered. The larger assessment of extradition and its consequences is committed to the Secretary of State." *Kin-Hong*, 110 F.3d at 110. "It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). Rather, "[t]he function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins*, 259 U.S. at 316. Thus, courts have emphasized that "[t]he person charged is not to be tried in this country for crimes he is alleged to have committed in the requesting country. That is the task of the . . . courts of the other country." *Eain*, 641 F.2d at 508; *see* FJC Manual, at 10 ("An extradition hearing is not a criminal trial and is not intended to ascertain guilt."). So long as "the judicial officer determines that there is probable cause, he '*is required to certify* the individual as extraditable to the Secretary of State.'" *Vo*, 447 F.3d at 1237 (quoting *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003)).

Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply. *See Mainero v. Gregg*,

164 F.3d 1199, 1206 (9th Cir. 1999); *see also* Fed. R. Crim. P. 1(a)(5)(A). Instead, 18 U.S.C. § 3190 provides that evidence may be admitted as long as the evidence is authenticated and would "be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." The accused, however, does not have the right to introduce evidence in defense because that would require the government seeking his extradition "to go into a full trial on the merits in a foreign country." *Collins*, 259 U.S. at 316 (quoting *In re Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The Supreme Court has drawn a distinction between evidence "properly admitted in behalf of the [accused] and that improperly admitted." *Id.* at 316. Evidence that may be admitted is evidence that "explain[s] matters referred to by the witnesses for the government," *Charlton*, 229 U.S. at 461, while "evidence in defense" that merely "contradict[s] the testimony for the prosecution" may be excluded, *Collins*, 259 U.S. at 316–17 (quoting *Charlton*, 229 U.S. at 461). *See Barapind*, 400 F.3d at 750 ("[E]xtradition courts 'do[] not weigh conflicting evidence' in making their probable cause determinations.") (second alteration in original) (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986)); *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978) (The "[a]dmission of evidence proffered by the fugitive at an extradition proceeding is left to the sound discretion of the court, guided of course by the principle" that a fugitive's right to introduce evidence rebutting probable cause is limited to introducing evidence that is "explanatory," but not "contradictory."); *Mainero*, 164 F.3d at 1207 n.7.

The difference between "explanatory" and "contradictory" evidence is easier stated than applied. The federal courts have struggled to distinguish between the two.

*See*, *e.g.*, *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("In practice," the line between contradictory and explanatory evidence "is not easily drawn"); *In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1122 (E.D. Cal. 2003) ("The distinction between evidence which 'explains' and evidence which 'contradicts' seems metaphysical."). Nevertheless, we have generally settled on the principle that "explanatory" evidence is evidence that "explains away or completely obliterates probable cause," whereas contradictory evidence is that which "merely controverts the existence of probable cause, or raises a defense." *Mainero*, 164 F.3d at 1207 n.7; *see also Eain*, 641 F.2d at 511 ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof."); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir. 1973) (holding that the extradition court had properly excluded evidence that "would in no way 'explain'—or, as the district judge put it, 'obliterate'—the government's evidence, but would only pose a conflict of credibility"). We have also described "contradictory" evidence as evidence "the credibility of which could not be assessed without a trial." *Barapind*, 400 F.3d at 749–50. In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof. *Hooker*, 573 F.2d at 1368. However, the accused may testify "to things which might have explained ambiguities or doubtful elements" in the government's case. *Collins*, 259 U.S. at 315–16. But he may not impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government. *See Charlton*, 229 U.S. at 461.

If the extradition court determines that there is probable cause to extradite, it enters an order certifying extradition to the Secretary of State, who ultimately decides whether to surrender the individual to the requesting state. 18 U.S.C. § 3186; *Vo*, 447 F.3d at 1237; *Quinn*, 783 F.2d at 789; Exec. Order No. 11,517, 35 Fed. Reg. 4,937 (Mar. 19, 1970), *reprinted in* 18 U.S.C. § 3193 Historical & Revision Notes. Once the district court has made its probable cause determination and entered an order certifying extradition, the order can only be challenged via a writ of habeas corpus, because the order is not final and there is no other statutory provision for direct appeal of an extradition order. *Vo*, 447 F.3d at 1240; *see Collins v. Miller (Collins I)*, 252 U.S. 364, 368 (1920).

## II.  PROCEEDINGS BELOW

Munoz is wanted in Mexico on kidnapping charges arising out of the kidnapping for ransom of Dignora Hermosillo Garcia ("Hermosillo") and her two young daughters from their home near Tepic, a city in the state of Nayarit, Mexico, in August 2005.  Hermosillo and her daughters were abducted from their home at gunpoint by a man in a ski mask.  The abductor eventually abandoned the two girls, one at a time, by the side of the road; the youngest of the girls died before she was found.  Hermosillo was similarly abandoned, with her mouth, eyes, ears, hands, and feet duct taped, after giving her captor the PIN for her bank card and her husband's cell phone number.  She managed to free herself using a piece of barbed wire, walked to the highway, and hitched a ride into the town of Jolotemba, where she called her husband to come pick her up.

Mexico requested Munoz's extradition.  He was arrested in the United States on May 17, 2006 in connection with the kidnapping.

A. *Extradition Hearing*

The U.S.-Mexico extradition treaty states that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place."  U.S.-Mexico Extradition Treaty, art. 3, May 4, 1978, T.I.A.S. No. 9656.  In other words, we assess whether, based on the evidence, the person could be brought to trial for the same crime in the United States.  Munoz stipulated below that all elements except probable cause have been satisfied—thus, the only element disputed in the extradition hearing, and here on appeal, is whether the probable cause element is satisfied.  The key question is what evidence the extradition court may consider in determining whether the charge against Munoz is supported by probable cause.

1.   The government's evidence

In order to establish probable cause that Munoz was involved in the kidnapping, the government relied principally on statements from two of Munoz's alleged co-conspirators, Jesus Servando Hurtado Osuna ("Hurtado"), and Fausto Librado Rosas Alfaro ("Rosas").  The government also submitted three additional statements to corroborate Rosas's and Hurtado's stories.  We review this evidence in detail below.

### a. Rosas's statement

On March 27, 2006, Rosas submitted a written preliminary statement to the presiding criminal trial judge in his case in Mexico implicating Munoz, Hurtado, and himself in the kidnapping of Hermosillo and her daughters. According to his statement, Rosas abducted Hermosillo and her daughters, but Munoz was the brains of the operation. Rosas stated that he had known Munoz for several years because they "have a business in which [they] buy and sell clothes." In July 2005, Munoz contacted Rosas on the phone about a "job" he was planning, and stated that he would explain in detail at a planned meeting in Tepic, Nayarit. In mid-July, Rosas met with Munoz, a man named "Negro," whom Rosas identified as Hurtado, and two others. At this point, Rosas learned what the "job" was. Munoz wanted to recruit Rosas to assist in a plan to kidnap Hermosillo and hold her for ransom, and Rosas agreed to participate. A few days later, the conspirators met at a nightclub at Zapata and Zacatecas Streets to discuss the details, including the amount of ransom to be demanded from "Beto." "Beto" is a common nickname for Roberto, which is the name of Hermosillo's husband, Roberto Castellanos Meza ("Castellanos"). According to Rosas, Hurtado was invited to participate in the job at this second meeting, and eventually agreed to join.

On August 9, 2005, the conspirators met again, and Rosas told Hurtado that his job was to watch the house and let the others know "when a lady in a white van arrived." On August 18, the day of the job, Hurtado informed the conspirators that Hermosillo had arrived home with her two daughters in a white Cherokee van. Rosas stated that he "hid behind the main door," and once in the house, threatened Hermosillo with a gun while wearing a black ski mask. He

was not supposed to take the two girls, but became nervous and put them in the backseat of the white Cherokee as well.

During the drive, Munoz called Rosas and instructed him to release the girls together. Rosas first released the girls and then Hermosillo at three different locations along the side of the road. He met with Munoz later that same day and gave him Hermosillo's cell phone. Munoz then called Castellanos, and demanded a ransom for Hermosillo and the girls even though they had already been released. Rosas stated that Munoz "kept making phone calls," and that he did not know why no one went to retrieve the girls from where he had left them, "because the plan was to take them to [a] rented house to take care of them." Munoz later got into an argument with one of the other conspirators, told Rosas that they "were in terrible trouble," and that he, Munoz, would handle it himself. Munoz then "escaped" and went to Hermosillo, Sonora.

### b. Hurtado's statement

Hurtado made a sworn statement to a Deputy District Attorney in Tepic, Nayarit, on March 14, 2006. He requested the assistance of his public defender, Juan Manuel Ramírez Dueñas, who accepted the designation. Hurtado first asserted that a statement he had given on October 12, 2005 to the district attorney was "completely false,"[2] and that he had been

---

[2] In October 2005, Hurtado gave a highly detailed, sworn statement to the Deputy District Attorney that told a very different story and which was not presented as part of the government's evidence in the extradition court. In his October 2005 statement, Hurtado stated that in early August before the kidnapping, he and two friends, El Pelon and El Sapo, had been smoking marijuana and made a plan to rob Hermosillo's house, because it "looked luxurious." Hurtado knew the house because he worked as a carpenter nearby. El Pelon and El Sapo agreed and said they would give

"inventing things as they came into [his] head" to throw off the police investigation of the kidnapping. He then stated he was ready to tell what he knew of the kidnapping.

During the last week of July 2005, Hurtado left his brother's carpentry shop, and while walking, ran into El Pelon, whom he identified as Jorge Gonzalo Lopez Chavez. Hurtado had known Lopez Chavez for about twenty years because they lived in the same neighborhood. They bought some beers and then Hurtado accompanied Lopez Chavez to

---

Hurtado 30,000 pesos to do the job. On August 18, at about 5:00 in the evening, Hurtado called El Sapo's phone and asked him whether he was going to participate in the robbery as planned. El Sapo said yes and that he was planning to enter the house with someone named "Chonte." At 8:00, Hurtado called a taxi, which he remembered was a white Atos, and went to Hermosillo's house. He stopped about two blocks away and called El Sapo again, who told him to wait until 10:00. When Hurtado called El Sapo again two hours later, he told him that he and Chonte were on the way to the house. Hurtado stated that he saw El Sapo's light brown Ford truck drive by the house and assumed that all was going according to plan. Hurtado then told the taxi driver to take him to buy cocaine at a nearby motel known as the "Posada Real." Hurtado and the taxi driver then drove back past Hermosillo's house, where they did not see anyone.

Hurtado said they got about two blocks down the street before they were stopped by several cars driven by men. The men pulled Hurtado out of the taxi and put him in the backseat of one of the other cars and demanded "Where is the truck?" Hurtado said he didn't know anything and that he had only been in the area to drink beer. The men questioned him for about thirty minutes and then put him and the taxi driver in the backseat of another car, where they were told that the men were "investigating something awful that had happened." Hurtado and the taxi driver were eventually released, and the taxi driver took Hurtado home.

Finally, Hurtado stated that he recognized a photo of Munoz that the District Attorney's Office showed him, and that he only knew Munoz by sight.

a paint store, and when they arrived, Lopez Chavez got out of the car and began speaking with El Chilango, whom Hurtado identified as Rosas. Hurtado stated that he had only known Rosas by sight for a few months. The three went back out to buy more beer and then returned to the paint store, where they stayed for about fifteen minutes, until Lopez Chavez took Hurtado home.

Approximately four days later, Hurtado ran into Lopez Chavez again, and Lopez Chavez asked Hurtado to accompany him downtown. They ran into Rosas again and the three went to a nightclub located on Zacatecas and Zapata streets. Munoz was waiting for them there. Hurtado did not know Munoz at that time. As they were inside drinking, Hurtado overheard Rosas ask Munoz, "Hey, what's going on with the job?" Hurtado didn't pay any attention to their conversation, and eventually left the club with Lopez Chavez. On the way home, he asked Lopez Chavez about the "job," but Lopez Chavez did not answer.

The next day, Hurtado went to Lopez Chavez's house to ask again about the "job," because he needed money. Lopez Chavez said that he could take Hurtado to see Rosas, who would tell him about the job, and Hurtado agreed. Lopez Chavez and Hurtado met with Rosas at the same nightclub, and Rosas pulled Hurtado aside, and asked if he "was up for a kidnapping." Hurtado said yes, thinking that Rosas was kidding. On August 9, Hurtado met with Rosas again, and Rosas confirmed that the kidnapping plot was real. Hurtado again agreed to participate and Rosas told him that all he had to do was watch the house and tell the others when Hermosillo arrived. Rosas showed Hurtado pictures of Hermosillo and the two girls, and told him that he would find him when it was time to put the plan into action.

On August 18, Rosas and Lopez Chavez came to Hurtado's house and told him that they were going to pull the job that night. Hurtado was supposed to watch the house and call Rosas's cell phone when Hermosillo arrived, and Rosas, Munoz, and another conspirator, Lopez Mendivil, would grab Hermosillo. The three were to drive Hermosillo to a rented house in a nearby town, and Hurtado was to wait and would be paid by Rosas. At about 9:00 that night, Hurtado took a white taxi to the neighborhood to keep watch. He called Rosas from a payphone when Hermosillo drove up, and then watched as Lopez Chavez and Rosas drove up to the house. Rosas ran into the garage "hooded," put Hermosillo and her two daughters in Hermosillo's car, and drove off at "full speed."

Hurtado got back into the taxi and drove by the place where Munoz and Lopez Mendivil were waiting, where he heard Munoz "telling . . . off" Rosas on the phone for not following the plan. The taxi then drove Hurtado home. Hurtado also noted that when he was driving around in the taxi that same night after the kidnapping, he was stopped twice by "afi agents" (Mexican federal authorities) and questioned about what he was doing at that time of night, but then released. He did not see the other members of the conspiracy again.

At the end of this statement, Hurtado declared that he had read Munoz's statement and that Munoz, Lopez Chavez, Rosas, and Lopez Mendivil lied when they denied their involvement. He identified Munoz's photograph as well. Finally, he stated that he was under "no coercion, physical or moral violence on the part of [the District Attorney's] office or on the part of the officers of the state police."

c.  Other evidence

The government submitted three other statements to corroborate Rosas's and Hurtado's statements implicating Munoz. It included Hermosillo's statement describing the details of her kidnapping and release and her identification of Rosas. According to Hermosillo, the abductor tugged on his ski mask while they were driving, and Hermosillo noticed that he had "a mole or a scar" on his nose. Hermosillo later identified Rosas as the man who had abducted her from her home based on photographs the Mexican authorities showed her. The government also introduced a statement by Benigno Andrade Hernandez ("Andrade"), who told Mexican prosecutors that he had been approached by Rosas and Munoz a month or so before the kidnapping, and asked if he was interested in "pulling a job" to extort "Beto" for two million pesos. Finally, the government included a statement from Castellanos, made to Mexican prosecutors, in which Castellanos described a phone call he had received from his wife's phone the day of the kidnapping, but had been cut off before he could answer. Castellanos tried unsuccessfully to locate his family after his brother informed him that the garage door to the family's house had been left open, and that Hermosillo's car was missing. The next morning, Castellanos received a call from Hermosillo asking him to pick her up in the town where Rosas had abandoned her.

2.  Munoz's additional evidence

To undermine the government's showing of probable cause, Munoz sought to introduce additional evidence at his extradition hearing, including several statements by Rosas and Hurtado alleging that their statements implicating Munoz

had been obtained by torture or coercion. Again, we review these statements in detail.

### a. Rosas's additional statements

On May 25, 2006, two months after providing his original preliminary statement, Rosas was given the opportunity to verify or retract his preliminary statement before a Mexican judge, under oath.[3] Rosas retracted, asserting that the police had forced him to sign his previous incriminating statement. He specifically identified a man named Martin Lujan, whom he described as a "coordinator," who "took [him] out of the place [he] was in by beating and threatening [him]." Rosas was told that if he did not sign the statement something "bad" would happen to his family, and that the police knew his wife had arrived in Hermosillo, Sonora. Rosas was asked whether state police forced him to appear before the media and "declare himself guilty," and he answered, "Yes."

Munoz also sought to introduce another statement by Rosas, made on June 20, 2006, again sworn in court. Rosas was represented by a public defender. He denied the parts of his preliminary statement in which he implicated himself, stating that when he was taken into court, he was only asked whether he recognized his own signature on the statement. He was not read the statement itself. He was told that something bad would happen to his family, and that the

---

[3] In Mexican courts, witnesses are given an opportunity to accept, reject, or amend their preliminary or "ministerial" statements when they make their first appearances before the judge trying a case—the purpose being to weed out false or coerced confessions. *See, e.g.*, *In re Extradition of Garcia*, 890 F. Supp. 914, 923–24 (S.D. Cal. 1994) (explaining the procedure in Mexican courts).

police knew his wife and son had arrived in a black Altima. Rosas also stated that he was beaten and threatened on several occasions while in custody. He again identified Martin Lujan, whom he described as the "General Director."

According to his June 20th statement, when Rosas was detained, he was taken to a cell, "without lights, and with only a chair." He was tied to the chair, had a bag placed over his head, and was struck repeatedly in the chest while being asked what he knew about the kidnapping. Rosas repeated facts that he remembered from the district attorney's file on the case, "so that they would stop torturing [him]." The next morning he was taken out of his cell, and told that he was going to a press conference, at which he was expected to implicate himself and Munoz, or else he would be beaten again. Rosas went to the press conference but denied his involvement in the kidnapping; he was brought back to the prison and held incommunicado for two days, during which time Lujan periodically beat him.

Eventually, the police sent a detailed written statement to Rosas through his lawyer, and Rosas was directed to sign it or else "something serious" would happen to his family. Rosas's lawyer "never told [him] anything" regarding the statement—Rosas stated that he made the decision to sign the statement alone, "due to the threats and beatings" to which he was subjected. Rosas was asked in court if Lujan ever told him why he wanted to force Rosas to confess, and Rosas said that Lujan told him that he was under pressure from "the father of the victims," who was "calling him and pressuring him from the outside."

### b.   Hurtado's additional statements

On March 22, 2006, Hurtado gave a similar statement before a judge in Mexico, under oath and represented by private counsel.  Hurtado stated that he "[did] not ratify" either his October 12, 2005 or March 14, 2006 statements, because the statements were false and had been obtained under torture.  Hurtado stated that after he dropped his daughter off at his mother's house, he was abducted, and forced into a "gray Lobo truck with tinted windows."  A "cap" was placed over his head, and he was taken to an unknown location.  Someone started hitting him in the face, asking him to "tell them the truth."  A plastic bag was placed over his head and tightened until he could not breathe.  Hurtado told his captors that he didn't know anything.  He was shown photographs of people but did not recognize anyone.  His captors poured water into his nose and mouth, beat him, and questioned him again.  According to Hurtado, this went on for several days.  He was told more than once that if he did not "cooperate" his daughter would be given to him in "pieces."

Eventually, Hurtado was taken out at night, blindfolded, and presented to "a man at a desk," where he was told that if he stated what he had been told to state, he would be allowed to see his family.  He made his statement as directed, and then was taken back to where he was being held captive.  The day before he was brought before the court, he was taken to the Public Prosecutor's Office, and the chief of the judiciary police told him that he had to "say what they had told [him] before."  He was not allowed to call his family or speak with a lawyer.  The police brought him before "cameramen" who were taking pictures and asking questions.

Hurtado stated that he had nothing to do with the kidnapping and did not know anyone involved. He identified the "man who caught [him]" as a "potbellied, tall judiciary police office with short, wavy hair." His attorney asked the court to take note of Hurtado's injuries, and the Clerk of the Court noted that Hurtado had "minor bruises on both cheekbones . . . complain[ed] about [a] left earache, as well as pain on the right foot next to the shin."

Hurtado gave another sworn statement before a judge on May 25, 2006, again represented by counsel, in which he reiterated much of his March 22 statement. He alleged that he had been detained by the state police for twelve days, during which time he was tortured, had bags placed over his face, was punched in the stomach, had water poured into his nose and mouth, and received death threats. He reiterated that he was "force[d]" to make incriminating statements.

On November 21, 2006, Hurtado gave further testimony in court, under oath and represented by counsel. He wished to add to his previous statements. He again reiterated that he had been detained, tortured, and kept hooded for days, and repeatedly been shown photographs of people he could not identify. He added that after he had been taken to the Prosecutor's Office to make a statement, he was taken again to the house where he was being held, and was given a written statement to sign. Several days later, he was taken back to the Prosecutor's Office, and when he arrived at the detention center, an inmate named Martin Lujan threatened him, and told him not to change his statement or he would be killed. He stated that he was afraid for his life and that of his family.

Finally, Munoz sought to introduce a declaration Hurtado made under oath on June 10, 2009, in which Hurtado essentially echoed the details of his previous statements. He repeated that he had been detained and beaten by the police for twelve days, told what statements to make, and that he ultimately agreed to sign a written statement because his family was threatened.

### c.  Other evidence

Munoz also sought to submit evidence to corroborate the torture allegations, including evidence that he had been tortured and his family threatened; a statement from another alleged co-conspirator, Lopez Chavez,  alleging that he had been tortured; evidence that Rosas's lawyer colluded with the Mexican government to get Rosas to sign an incriminating statement; evidence supporting Munoz's alibi; and evidence regarding the acquittal of another co-conspirator for insufficient evidence.

### 3.  The extradition court's decision

In a published order, a magistrate judge, sitting as the extradition court, carefully considered the government's evidence against Munoz and Munoz's offer of evidence rebutting the government's probable cause showing.  The court concluded that Munoz was extraditable and declined to consider the additional evidence Munoz sought to admit, including the statements by Rosas and Hurtado alleging torture. *In re Extradition of Munoz Santos*, 795 F. Supp. 2d 966 (C.D. Cal. 2011).  The extradition court focused on the fact that the allegations of coercion were contained in statements in which Rosas and Hurtado had also recanted their previous statements implicating Munoz. *Id.* at 987.  The

court noted that the Ninth Circuit had "never determined" whether "recantation evidence is admissible in an extradition hearing." *Id.* at 988 (quoting *Mainero*, 164 F.3d at 1207 n.7). However, the extradition court relied on our decision in *Barapind*, in which we concluded that probable cause was not undermined in an extradition proceeding by a witness's recantation of a prior incriminating statement, because the credibility of the recantation could not be determined without a trial, "which would exceed the limited mandate of an extradition court." *Id.* (quoting *Barapind*, 400 F.3d at 749). The extradition court concluded that the recantation statements were "contradictory" evidence inadmissible in extradition proceedings. *Id.* at 988–89. Because Rosas's and Hurtado's allegations of coercion were included in their recantation statements, the allegations of coercion were likewise inadmissible "contradictory" evidence. *Id.* at 989. Accordingly, based on the admissible evidence offered by the government, the extradition court concluded that there was sufficient evidence to support a finding of probable cause, and it certified that Munoz was extraditable. *Id.* at 979–83.

## B. *Habeas Proceedings*

In 2011, Munoz filed a habeas petition challenging the extradition order, claiming that the extradition court had committed legal error in ruling the evidence of torture inadmissible. App. at 2–3. In a thorough opinion, the district court declined to issue the writ.[4] The district court agreed that if Munoz could show that the confessions of key witnesses "were procured through torture or duress," that

---

[4] The district court's opinion is not published in any database. Because of its importance to this case, we have reprinted it in an appendix to this opinion.

showing would "undermine the evidence on which the government relies to meet its burden." App. at 8. The court distinguished between "recantation" statements that directly contradict a previously offered version of the facts, which would require the extradition court to make impermissible credibility determinations, and evidence that a statement was procured by torture. App. at 10. The court explained that evidence that a statement was procured by torture is not necessarily "contradictory," and thus inadmissible in extradition proceedings, because it does not inherently "present an alternate version of events, or factually contradict the [requesting] government's probable cause narrative." App. at 11. Rather, evidence that a statement was obtained through torture "addresses the reliability of the incriminating statements the government has presented and questions their competence." App. at 11. Therefore, such evidence is theoretically admissible in extradition proceedings. App. at 11–12. The court observed:

> While extradition courts cannot weigh conflicting evidence, evidence of torture does not require such weighing. Evidence of torture addresses the circumstances under which the government's witnesses made inculpatory statements; an extradition court properly considers evidence of torture, duress, or unlawfully procured confessions in deciding the reliability of the government's evidence.

App. at 12.

Nevertheless, the district court concluded that it was impossible to distinguish between Rosas's and Hurtado's

statements regarding torture, and their recantation of their previous incriminating statements.**5** Evaluating the torture statements "would almost certainly require the extradition court to determine whether the recantations are more reliable than the original inculpatory statements." App. at 19. Thus, the district court ultimately agreed with the extradition court that the torture statements could not be considered. Likewise, the district court concluded that admission of the other evidence Munoz sought to offer, e.g., the alibi evidence, etc., was either irrelevant to the question of how the inculpatory statements were obtained or would require the extradition court to make impermissible credibility determinations and thus was properly excluded. App. at 20–24.

A panel of this court affirmed, agreeing that the statements concerning torture were properly excluded by the extradition court, and concluding that Rosas's and Hurtado's statements were "inadmissible recantations." *Munoz Santos v. Thomas*, 779 F.3d 1021, 1026–28 (9th Cir. 2015). The panel concluded that the "allegations of torture are 'inextricably intertwined' with Rosas'[s] and Hurtado's recantations," because "[e]ach recantation includes both a disavowal of the witness's prior inculpatory statements, as well as allegations that the statements were procured by torture." *Id.* at 1027. As a result, "the extradition court would necessarily have had to evaluate the veracity of the recantations and weigh them against the conflicting

---

**5** The government argued that probable cause could be established on the basis of Hermosillo's, Castellanos's and Andrade's testimony alone, given that there was no claim that their testimony was coerced. The district court found the question "close," but concluded that "these statements do not provide an adequate basis for affirming the extradition court's order." App. at 17 n.41. That conclusion made Hurtado's and Rosas's statements critical to the government's case.

inculpatory statements.  Doing so would have exceeded the limited authority of the extradition court."  *Id.*

We granted en banc review and vacated the panel opinion. *Munoz Santos v. Thomas*, 804 F.3d 998 (9th Cir. 2015).

## III.  JURISDICTION AND STANDARD OF REVIEW

The extradition court had jurisdiction under 18 U.S.C. § 3184.  The district court had jurisdiction pursuant to 28 U.S.C. § 2241(a), and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).  Under § 3184, "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States" may sit as an extradition court to consider whether the evidence is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  If so, the extradition court "shall certify the same . . . to the Secretary of State." 18 U.S.C. § 3184.

There is no right of direct appeal to a district court or a court of appeals from the extradition court's certification of extraditability.  Because the extradition court's order is not final for purposes of 28 U.S.C. § 1291, the "only available avenue to challenge an extradition order" is through a habeas petition.  *Vo*, 447 F.3d at 1240; *see Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1402 (9th Cir. 1988).

> The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell

within the treaty's terms, and (3) there is "any competent evidence" supporting the probable cause determination of the magistrate.

*Vo*, 447 F.3d at 1240; *see Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Our review is similarly circumscribed. We review the district court's judgment de novo. *McKnight v. Torres*, 563 F.3d 890, 892 (9th Cir. 2009). In this context, that means that, with respect to the extradition court, we stand in the same position as did the district court. We review the extradition court's legal rulings de novo, and its findings of fact for clear error. And "[b]ecause the magistrate's probable cause finding is thus not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,' it must be upheld if there is any competent evidence in the record to support it." *Quinn*, 783 F.2d at 791 (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

## IV. ANALYSIS

The issue before us is whether the extradition court properly refused to consider evidence that Rosas's and Hurtado's statements—in which they confessed to their involvement in the kidnapping and implicated Munoz—were obtained by coercion, including torture. The extradition court refused to consider evidence of coercion because it was contained in subsequent statements in which Rosas and Hurtado recanted their earlier testimony. The extradition court excluded the subsequent statements because they were "contradictory" and not "explanatory," rendering the statements inadmissible under the Supreme Court's framework governing an extraditee's ability to present evidence in the extradition proceeding. For reasons we explain in Part A, this was legal error. The extradition court

should have considered the evidence of coercion because a coerced statement is not competent evidence and cannot support probable cause.

In Part B we address a second issue: whether, assuming arguendo that we must exclude Rosas's and Hurtado's confessions, there is sufficient evidence of probable cause to affirm. We conclude that we cannot resolve this question on this record, and we remand this case to the district court with instructions to return this case to the extradition court for further proceedings to address the competency and the sufficiency of the government's evidence.

A.  *Exclusion of Rosas's and Hurtado's Statements*

Our task is to determine whether there is any competent evidence supporting the extradition court's finding of probable cause. The extradition court found probable cause based largely on inculpating statements made by Rosas and Hurtado, Munoz's alleged co-conspirators. We took this case en banc to clarify whether evidence that these statements were obtained by torture or other coercion constitute "contradictory" evidence inadmissible in an extradition proceeding, or admissible "explanatory" evidence.

There can be little question that, standing by themselves, Rosas's March 27, 2006 statement and Hurtado's March 14, 2006 statement, whether considered separately, together, or together with statements from Hermosillo (the victim), Castellanos (her husband), and Andrade (who may have heard early plans for the kidnapping) constitute probable cause to believe that Munoz participated in the kidnapping of Hermosillo and her daughters. The statements were detailed and authenticated.  Hurtado gave his statement in the

presence of his public defender and under oath to a deputy district attorney in Mexico. Rosas submitted his statement in writing to the judge presiding over his case and asked that it be included in the court's record.

The extradition court, however, refused to consider subsequent statements by Rosas and Hurtado in which they recanted their initial statements, claiming that the Mexican police had coerced them into making those statements. The extradition court, and the district court on habeas, concluded that the allegations of torture were inadmissible because, as the district court described it, the claims were "inextricably intertwined" with the recantation statements. App. at 19–20; *Extradition of Munoz Santos*, 795 F. Supp. 2d at 988–90. In other words, both courts reasoned that it was impossible to determine the credibility of the allegations of torture without determining the credibility of Rosas's and Hurtado's recantation statements. Because the credibility of the recantation statements could not be determined without a trial, those statements were inadmissible as "contradictory" evidence. App. at 19–20; *Id.* at 990.

As we review Rosas's and Hurtado's various subsequent statements, which are quite detailed, their claims are of two types (and here we are simplifying): (1) I wasn't involved, and (2) the reason I previously said I was involved is that I was tortured or otherwise coerced. The first type of statement is a recantation of the kind that courts have properly refused to consider. For example, in *Barapind* we considered whether there was evidence to support Barapind's extradition to India for crimes in connection with his activities as a leader in the All India Sikh Student Federation. In support of the charges, India produced an affidavit from a police inspector, who claimed that Nirmal Singh, an eyewitness, had identified

Barapind as one of the principals in a shootout with government officials. *Barapind*, 400 F.3d at 752. Barapind produced a second affidavit from Nirmal in which he denied having identified Barapind at all. "The extradition court determined that Barapind's evidence was insufficient to destroy probable cause, concluding that a trial would be required to determine who was telling the truth." *Id.* We concluded that the court made the proper decision. *Id.*

Similarly, in *Bovio v. United States*, the petitioner argued that probable cause was lacking, in part, because the major witness on which the government relied had admitted to lying during the investigation. 989 F.2d 255, 259 (7th Cir. 1993). The Seventh Circuit rejected this argument, noting that "Bovio [had] no right to attack the credibility of witnesses," because "issues of credibility are to be determined at trial." *Id.* Consistent with both *Barapind* and *Bovio*, in *Shapiro v. Ferrandina*, the Second Circuit upheld the extradition court's refusal to admit evidence "that one declarant of an inculpatory statement had once blackmailed Shapiro's father and that certain fraudulent statements alleged to have been made by Shapiro had not in fact been made." 478 F.2d at 905. The court noted that "such statements would in no way 'explain' . . . the government's evidence, but would only pose a conflict of credibility." *Id.*

Rosas's and Hurtado's recantations of their prior confessions are, indeed, contradictory. But their claims that their prior statements implicating themselves and Munoz were obtained under duress are not contradictory, but explanatory. Recanting statements contest the *credibility* of the original statements, presenting a different version of the facts or offering reasons why the government's evidence should not be believed. Reliable evidence that the

government's evidence was obtained by torture or coercion, however, goes to the *competence* of the government's evidence.

The Supreme Court has long held that the Due Process Clause of the Fifth and Fourteenth Amendments bars the admission of coerced confessions. "The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession." *Ashcraft v. Tennessee*, 322 U.S. 143, 155 (1944). As the Court explained in *Brown v. Mississippi*, "trial . . . is a mere pretense where the state authorities have contrived a conviction resting solely upon confessions obtained by violence . . . and the use of the confessions thus obtained as the basis for conviction and sentence [is] a clear denial of due process." 297 U.S. 278, 286 (1936); *see Ashcraft*, 322 U.S. at 159 (Jackson, J., dissenting) ("Forced confessions are ruled out of a fair trial."); *Ward v. Texas*, 316 U.S. 547, 555 (1942) ("[T]his confession was not free and voluntary but was the product of coercion and duress, that petitioner was no longer able freely to admit or to deny or to refuse to answer, and that he was willing to make any statement that the officers wanted him to make."); *Chambers v. Florida*, 309 U.S. 227, 236–37 (1940); *Palko v. Connecticut*, 302 U.S. 319, 326 (1937).

We and other courts have sometimes explained the inadmissibility of coerced confessions in terms of their unreliability. *See, e.g.*, *Crowe v. County of San Diego*, 608 F.3d 406, 433 (9th Cir. 2010) ("[C]oerced confessions are legally insufficient and unreliable and thus cannot factor into the probable cause analysis."); *Livers v. Schenck*, 700 F.3d 340, 358 (8th Cir. 2012) ("No reasonable officer could believe statements from a coerced confession could

alone provide probable cause."); *Kin-Hong*, 110 F.3d at 121 ("[A] confession obtained by duress is inherently unreliable and would be given little weight even if the confession were authenticated."). But the Supreme Court has made clear that "[t]he aim of the requirement of due process is not to exclude presumptively false evidence but to prevent fundamental unfairness in the use of evidence *whether true or false*." *Lisenba v. California*, 314 U.S. 219, 236 (1941) (emphasis added). The Court offered an extended explanation in *Lego v. Twomey*:

> [T]here may be a relationship between the involuntariness of a confession and its unreliability. But our decision [in *Jackson v. Denno*, 378 U.S. 368 (1964)] was not based in the slightest on the fear that juries might misjudge the accuracy of confessions and arrive at erroneous determinations of guilt or innocence. That case was not aimed at reducing the possibility of convicting innocent men.
>
> Quite the contrary, we feared that the reliability and truthfulness of even coerced confessions could impermissibly influence a jury's judgment as to voluntariness. *The use of coerced confessions, whether true or false, is forbidden because the method used to extract them offends constitutional principles.*

404 U.S. 477, 484–85 (1972) (emphasis added) (footnote omitted). "To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding

confessions that are not voluntary does not rest on this consideration." *Rogers v. Richmond*, 365 U.S. 534, 541 (1961); *see also United States v. Preston*, 751 F.3d 1008, 1017–18 (9th Cir. 2014) (en banc).

The Court's clarity on this point gives us a different perspective on Munoz's claim that the principal evidence against him was obtained through coercion that may have amounted to torture.[6] His claims of coerced testimony are independent of the truthfulness of the testimony. It is irrelevant whether Rosas's and Hurtado's statements about their involvement in the kidnapping are true; we do not care if they have indicia of reliability or whether they are corroborated by other evidence. If they were obtained by coercion in violation of the principles in the Due Process Clause of the Fifth Amendment, the statements are not competent and cannot support probable cause. In the language of the extradition cases, such statements are not "contradictory" because the truthfulness of the statements is not the issue. The fact of coercion is "explanatory" because, as the district court stated, it "addresses the circumstances under which the government's witnesses made inculpatory statements." App. at 12.

An allegation of coercion is essentially a second-order question—a question about questions; the allegation undermines the process by which the evidence was obtained,

---

[6] Because the Due Process Clause prohibits the use of coerced statements, including those obtained by torture, we need not address whether the Convention Against Torture would also prohibit the use in extradition proceedings of statements obtained under torture. *See* Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, art. 15, Dec. 10, 1984, 1465 U.N.T.S. 85.

not the credibility of the evidence itself.  There are a number
of examples in which we and other courts have distinguished
between the evidence and the process.   This is true even
where the allegations of torture or coercion appear alongside
claims that a previously made incriminating statement is not
true—i.e., where the allegations of coercion include
recantation statements.  In these cases, once the evidence of
coercion is admitted, courts weigh whether the allegations of
coercion are credible, and if so, whether probable cause still
exists once the tainted evidence is excluded from the analysis.
*See, e.g.*, *Cornejo-Barreto*, 218 F.3d at 1008 ("To isolate any
possible taint the alleged torture could have on the evidence
supporting the probable cause determination, the judge
considered the sufficiency of the evidence without the
challenged confessions."); *Mainero*, 164 F.3d at 1206 (noting
that the magistrate judge "carefully considered the
recantations offered . . . [and] . . . acknowledged that the
suggestion of torture is present in the record," but upholding
the lower court's conclusion that the torture allegations were
not sufficiently reliable to undermine probable cause); *In re
Extradition of Atuar*, 300 F. Supp. 2d 418, 431 (S.D. W. Va.
2003) (noting that a recantation statement is admissible "[i]f
it is evident . . . that the inculpating statement was coerced
and not made voluntarily," in which case the court should
consider "which of the statements is more reliable in view of
the totality of the evidence"), *aff'd*, 156 F. App'x 555 (4th
Cir. 2005); *In re Extradition of Singh*, 170 F. Supp. 2d 982,
1021–23, 1028–29 (E.D. Cal. 2001) (evaluating allegations of
torture and concluding that the statements were reliable and
destroyed probable cause as to two of eleven charges), *aff'd
in relevant part by Barapind*, 400 F.3d 744; *In re Extradition
of Contreras*, 800 F. Supp. 1462, 1469 (S.D. Tex. 1992)
("Obviously, where the indicia of reliability is on the prior
inculpating statement, then a recantation, if admitted, would

not negate the existence of probable cause . . . [but] where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane."); *Gill v. Imundi*, 747 F. Supp. 1028, 1043–47 (S.D.N.Y. 1990) (granting writ of habeas corpus because new extradition hearing was required in light of a recent ruling by an Indian court that the confession on which probable cause was based had been coerced); *cf. Hoxha*, 465 F.3d at 561 (holding that the district court did not err in excluding recantation statements, some of which included allegations of torture, because other competent evidence supported probable cause).

In sum, we have treated allegations of torture or coercion differently from a recantation statement, even where the allegations of coercion are made in conjunction with a claim that a previous incriminating statement was false. Contrary to what the district court and the extradition court concluded here, it is possible to separate the two inquiries. Indeed, to hold otherwise would create an odd rule in which allegations of coercion would only be admissible when the witness admits that the incriminating statements were true. This makes little sense, because the question of whether a recantation statement is *credible* or not is irrelevant to the question of whether the incriminating statement—recanted or not—was obtained under coercion, i.e., is *competent* evidence. We conclude that evidence that a statement was obtained under torture or other coercion constitutes "explanatory" evidence generally admissible in an extradition proceeding. An extradition court may properly consider evidence of torture or coercion in considering the competency of the government's evidence, even when the claim of coercion is intertwined with a recantation.

Our decision in *Barapind* supports our conclusion.  We observed in that case that the extradition court had conducted "a careful, incident-by-incident analysis as to whether there was impropriety on the part of the Indian government" in obtaining the statements on which probable cause rested. *Barapind*, 400 F.3d at 748.  On two of the eleven charges brought against the petitioner, the extradition court found that allegations of torture undermined probable cause.  With respect to one of the charges, the single witness alleged that his previous incriminating statement was involuntarily obtained and that he had never identified Barapind or the other alleged assailants in the case. *Extradition of Singh*, 170 F. Supp. 2d at 1021–22.  India declined to challenge the witness's explanation.[7]  The extradition court weighed the credibility of this statement and concluded that, under the totality of the circumstances, the later affidavit "destroy[ed] the competence of the evidence and obliterate[d] probable cause" for the charge. *Id.* at 1023.  On the second charge, India had submitted the confession of a co-conspirator, who was later killed.  Barapind submitted affidavits from three witnesses who stated that the confession had been obtained by torture while the co-conspirator was in police custody. India apparently did not dispute this evidence, and the court again concluded that the three witness statements alleging torture were reliable and the confession should be excluded. *Id.* at 1028–29.

The portion of our decision in *Barapind* that appears to have presented a stumbling block for both the extradition court and the district court here involved a different charge

---

[7] Belying the dissent's assertion that "[f]oreign governments seeking extradition are unlikely to let allegations of torture lie unanswered." Dissenting Op. at 71.

based on the inculpatory affidavit of Makhan Ram. Barapind offered a second affidavit from Ram in which Ram claimed that police had forced him to sign blank pieces of paper, on which statements incriminating Barapind were later written. Ram said his statement implicating Barapind was a "falsification." *Id.* at 1024; *see also Barapind*, 400 F.3d at 749–50. The extradition court analyzed this statement and factors going to its reliability, and ultimately concluded that, under the circumstances, the court could not determine Ram's credibility. Accordingly, the extradition court concluded that Ram's statement did not undermine probable cause. *Extradition of Singh*, 170 F. Supp. 2d at 1024–25. We affirmed, finding that Ram's statement constituted "conflicting evidence," because its credibility could not be determined without a trial, and that it would have been improper for the extradition court to engage in the kind of review that would have been necessary to determine the statement's credibility. *Barapind*, 400 F.3d at 749–50.[8]

The extradition court and the district court here relied on this section of *Barapind* in concluding that Rosas's and Hurtado's statements alleging coercion were *inadmissible* evidence. But what the extradition court did here is different from what the extradition court did in *Barapind*. In *Barapind*, the extradition court first *considered* the allegations of coercion, before concluding that it could not determine their reliability without exceeding the scope of its review. Here, however, the extradition court refused to consider Rosas's and Hurtado's statements *in the first*

---

[8] Our extended discussion of *Barapind* rebuts the dissent's unfounded claim that we have "recant[ed]" that decision. Dissenting Op. at 64. Far from it: we have carefully explained why our decision here follows from our nuanced decision in *Barapind*.

*instance*.  This was error.  A petitioner in an extradition proceeding has the right to introduce evidence that "explains away" or "obliterates" probable cause, and credible evidence that a statement was obtained under coercion does just that by undermining the competence of the government's evidence.

The dissent argues that the government's evidence need only be properly authenticated, as required under 18 U.S.C. § 3190, to be admissible in an extradition proceeding, seeming to suggest that admissibility necessarily renders the government's evidence sufficient to satisfy probable cause. Dissenting Op. at 61–64.  Such a suggestion conflates the admissibility standard with the standard required to satisfy probable cause.  Simply because evidence has been authenticated does not mean any evidence the government submits is sufficient to satisfy probable cause.  Were that the case, the judiciary's role in the extradition process would be meaningless.  Our role here is indeed a limited one, but "[t]his is not to say that a judge . . . [in] an extradition proceeding is expected to wield a rubber stamp." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011).  Rather, our "function in an extradition hearing is . . . to ensure that our judicial standard of probable cause is met by the Requesting Nation." *United States v. Linson*, 88 F. Supp. 2d 1123, 1128 (D. Guam 2000).  As we have made clear, the manner in which evidence used to support probable cause was obtained is relevant in determining whether the probable cause standard has indeed been satisfied.  Our case law, including Supreme Court case law that the dissent largely ignores, does not allow us to leave this determination to the Secretary of State—or, for that matter, the Mexican courts—under principles of deference to the executive or international comity.  Dissenting Op. at 74.  The probable

cause determination has been placed squarely in the judiciary's hands and is ours alone.[9]

We wish to be clear, however, that the scope of our holding here is limited, and that our decision should not be taken as a license to engage in mini-trials on the question of coercion or torture. The extradition court does not have to determine which party's evidence represents the truth where

---

[9] Nor does the rule of non-inquiry apply here: the long-standing principle that courts should refrain from inquiring into how an individual *will be treated* by a foreign state if extradited. In other words, the rule bars the judiciary from preventing the surrender of a fugitive on the basis of humanitarian considerations once extradition has been certified, reserving that decision to the Secretary of State. *See, e.g.*, *Hoxha*, 465 F.3d at 563 ("[H]umanitarian considerations are within the purview of the executive branch and generally should not be addressed by the courts in deciding whether a petitioner is extraditable."); *Prasoprat v. Benov*, 421 F.3d 1009, 1116 (9th Cir. 2005) ("We have long adhered to the rule of non-inquiry—that it is the role of the Secretary of State, not the courts, to determine whether extradition should be denied on humanitarian grounds or on account of the treatment that the fugitive is likely to receive upon his return to the requesting state."); *Blaxland*, 323 F.3d at 1208 ("While potential abuses in the requesting country rising to the level of torture are reviewable by American courts . . . judges generally refrain from examining the penal systems of requesting nations, leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely.") (quotations omitted); *Mainero*, 164 F.3d at 1205 n.6 ("[The so-called 'rule of non-inquiry' recognizes that '[a]n extradition court will generally not inquire into the procedures or treatment which await a surrendered fugitive in the requesting country.'") (quoting *Arnbjornsdottir-Mendler v. United States*, 721 F.2d 679, 683 (9th Cir. 1983)); FJC Manual at 26 ("[T]he rule of non-inquiry reserves for the Secretary of State the task of assessing whether there are political or humanitarian grounds to deny extradition."). The question we address in this case has to do with whether there is probable cause to extradite Munoz to Mexico, not how Munoz will be treated if he is removed to Mexico. Hence, the rule of non-inquiry is inapplicable.

the facts are contested.  Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court's limited review, the court has fulfilled its obligation—as the extradition court did in *Barapind*.  If the court cannot determine the credibility of the allegations (or other evidence) once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition.  *See* 18 U.S.C. § 3184.

The extradition court, of course, may consider other evidence, separate from potentially tainted evidence, that will satisfy the probable cause requirement.  *See, e.g.*, *Barapind*, 400 F.3d at 749–50; *Mainero*, 164 F.3d at 1206; *cf. Hoxha*, 465 F.3d at 561–62 (holding that exclusion of evidence of coercion was proper where other competent evidence supported probable cause).  Furthermore, we note that the fact that evidence of torture can properly be considered by the extradition court as "explanatory" evidence does not mean that *all* evidence of torture must be admitted.  The extradition court still has broad discretion to determine the admissibility of the evidence before it.  *See Mainero*, 164 F.3d at 1206; *Hooker*, 573 F.2d at 1369; *see also In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) ("The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request.").

Our holding today is narrow: Evidence that a statement was obtained by coercion may be treated as "explanatory" evidence that is admissible in an extradition hearing.

B. *Probable Cause*

Although we have concluded that the extradition court improperly excluded Rosas's and Hurtado's subsequent statements alleging that their initial inculpatory statements had been obtained by coercion, our inquiry is not at an end. Our inquiry on habeas review is whether *any* competent evidence supports the extradition court's probable cause finding. *Vo*, 447 F.3d at 1240; *see Fernandez*, 268 U.S. at 312. Evidentiary error alone is not a sufficient basis on which to grant a writ of habeas in the extradition context. *See Collins*, 259 U.S. at 316 ("It is clear that the mere wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal.").

The district court carefully considered whether, if the court excluded Rosas's and Hurtado's statements, there remained sufficient evidence to support a probable cause finding against Munoz. It concluded that the matter was "close," but that there was not. App. at 17–18 n.41. We share the district court's doubts. Neither Castellanos's nor Hermosillo's statements mention Munoz; at best they connect Rosas to the kidnapping, but only Rosas's and Hurtado's statements implicate Munoz. Without Rosas's and Hurtado's statements, only Andrade's statement that Rosas and Munoz approached him about a "job" to extort "Beto" for two million pesos potentially connects Munoz to the kidnapping. This statement, however, lacks any other specifics that would suggest the "job" was a kidnapping involving Roberto Castellanos's family. Standing alone, Andrade's statement is insufficient to support probable cause. This is not a case in which there is overwhelming evidence available from other sources. Nevertheless, because the question is a close one, we think the extradition court should decide this question in

the first instance, when it will have the opportunity to redetermine the admissibility of Munoz's evidence and then consider all of the evidence together.

The extradition court here "operated under a mistaken understanding of what constitutes circuit law," *Barapind*, 400 F.3d at 750, and took an overly restrictive view of its authority to consider evidence that an inculpatory statement was obtained under coercion. In light of our conclusion that the extradition court may consider allegations of coercion, even when they are included in a recantation statement, we think it best to return this matter to the extradition court for reconsideration. *See, e.g.*, *Caplan*, 649 F.2d at 1343–45; *Greci v. Birknes*, 527 F.2d 956, 960–61 (1st Cir. 1976); *United States ex rel. D'Amico v. Bishopp*, 286 F.2d 320, 321–23 (2d Cir. 1961); *Gill*, 747 F. Supp. at 1046. Since this case is here on habeas and not on direct appeal, our mechanism for returning this case to the extradition court is necessarily circuitous, because "the proceeding before a committing magistrate in international extradition is not subject to correction by appeal." *Collins I*, 252 U.S. at 369. We cannot issue or refuse the certification of extraditability; we can only order the release of the accused if there are no grounds for holding him, a judgment we are unwilling to make on the present record. As a result, we will remand the case to the district court with instructions to grant the writ of habeas corpus unless a judge or magistrate certifies Munoz's extraditability within a reasonable time and after proceedings consistent with this opinion. *See Shapiro*, 478 F.2d at 914; *Gill*, 747 F. Supp. at 1046, 1050. "If the magistrate so certifies, the district court shall thereupon dismiss the petition, except it may entertain renewal thereof for adequate cause." *Greci*, 527 F.2d at 961 (following *Shapiro*). "This somewhat cumbersome method of remand is needed because,

owing to the collateral nature of habeas corpus review in an extradition proceeding, we have no direct power to vacate or modify the extradition court's certification." *Caplan*, 649 F.2d at 1345 n.18 (citing *Shapiro*, 478 F.2d at 914).

The extradition court may consider the competency and sufficiency of the government's evidence, exercise discretion as to the admission of Munoz's proffered evidence, and consider any other evidence it deems necessary, consistent with our opinion. *See, e.g.*, *Greci*, 527 F.2d at 960–61. Our decision does not foreclose a finding by the extradition court that the allegations of coercion are unreliable or insufficient to undermine probable cause or that Munoz is, in fact, extraditable. Rather, we simply decline to make these determinations in the first instance before the extradition court has had a chance to do so.

## IV. CONCLUSION

We reverse the judgment of the district court and remand this case to the district court with instructions to discharge the petitioner unless, within 90 days, the extradition court certifies Munoz's extraditability under 18 U.S.C. § 3184 after proceedings consistent with this opinion. If the extradition court issues a certificate of extraditability to the Secretary of State, the district court shall dismiss the petition, subject to renewal for adequate cause.

**REVERSED AND REMANDED.**

**APPENDIX**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JS - 6

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 11-06330 MMM | Date | August 3, 2012 |

| | |
|---|---|
| Title | *Munoz Santos v. Thomas* |

Present: The Honorable    MARGARET M. MORROW

| ANEL HUERTA | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

Proceedings:        **Order Denying Petition for Writ of Habeas Corpus**

On August 1, 2011, Jose Luis Munoz Santos filed a petition for a writ of habeas corpus.[1] He challenges his detention in federal custody pursuant to an order certifying his extradition to Mexico issued by Magistrate Judge Andrew J. Wistrich. With the court's permission, on August 31, 2011, Munoz Santos filed an amended supplement to his petition.[2] The government requests that the court deny the petition.[3]

## I. BACKGROUND

**A.    The Extradition Proceedings and the Arguments Raised in Munoz's Habeas Petition**

Judge Wistrich's order describes the extradition proceedings, as well as the parties' respective

---

[1]Petition for Writ of Habeas Corpus by a Person in Federal Custody, Docket No 1 (Aug. 1, 2011). Reply to Government's Opposition to Petition for Writ of Habeas Corpus ("Reply"), Docket No. 28 (Dec. 12, 2011).

[2]Amended Supplement to Petition for Writ of Habeas Corpus by Person in Federal Custody ("Amended Petition"), Docket No. 12 (Aug. 31, 2011).

[3]Opposition to Amended Petition for Writ of Habeas Corpus ("Opp."), Docket No. 25 (Nov. 21, 2011), Exh. A ("Extradition Order").

1

filings in that matter.[4]   In summary, the government seeks Munoz's extradition to Mexico to face charges of kidnaping and homicide arising from his alleged involvement in the kidnaping of a woman named Dignora Hermosillo Garcia and her two young daughters, K.C.H. and C.J.C.H.[5] These events purportedly took place on or about August 18, 2005, in Tepic, a city in the state of Nayarit, Mexico. The kidnaping resulted in C.J.C.H.'s death.[6]  Subsequent legal proceedings narrowed the charge against Munoz to kidnaping; on September 4, 2007, a Mexican court issued a superseding warrant for his arrest.[7]   Munoz was arrested in the United States on May 17, 2006, and extradition proceedings commenced that led to Judge Wistrich's order.[8]

In certifying Munoz's extradition, Judge Wistrich reviewed the Mexican government's evidence, which consisted of five statements from Hermosillo and purported participants in the kidnaping. Judge Wistrich deemed these statements "competent evidence" that sufficed to meet the government's burden of establishing probable cause.[9]  He also addressed various items of evidence proffered by Munoz, which allegedly "explained away" or "obliterated" the government's proof. Judge Wistrich excluded Munoz's evidence, citing case law holding that evidence tending to "contradict" the government's evidence of probable cause is not inadmissible in extradition proceedings.[10]

Munoz's petition also alleged a claim under the United Nations Convention Against Torture ("CAT"), and proffered evidence that he would be subjected to torture if he were returned to Mexico. Judge Wistrich rejected this argument, concluding that the claim was not ripe for review until the Secretary of State determined that Munoz would be surrendered to the requesting nation.[11]  Munoz further asserted that he should not be extradited for humanitarian reasons, but Judge Wistrich held that the rule of non-inquiry placed that question in the hands of the Secretary of State, not the courts.[12]

In this habeas proceeding, Munoz challenges the order certifying his extradition on two bases.

---

[4]Order Certifying Extraditability at 1-3. Judge Wistrich's order is published in the official reporter.  See *In re Extradition of Santos*, 795 F.Supp.2d 966 (C.D. Cal. 2011).

[5]*Id.* at 2.

[6]*Id.*

[7]*Id.*

[8]*Id.*

[9]*Id.* at 26.

[10]*Id.* at 38.

[11]*Id.* at 39.

[12]*Id.* at 30-40.

The first concerns the evidence on which the government, and Judge Wistrich, relied to establish probable cause for Munoz's extraditability. Munoz contends (a) that the government submitted several witness statements that showed he was involved in the crimes, but also submitted evidence indicating that the statements were procured via torture, and that Judge Wistrich improperly excluded evidence of torture as beyond the scope of his review; (b) the government's own evidence was so riddled with contradictions that it was insufficient to meet the probable cause standard; and (c) Judge Wistrich improperly declined to admit extrinsic evidence proffered by Munoz that would have "explained away" the government's evidence.

Munoz's second primary challenge to his extradition is that he faces a "very real prospect of torture" if he is returned to Mexico.[13] He claims relief under the United Nations Convention Against Torture ("CAT").

The government, for its part, argues that Judge Wistrich properly excluded the evidence Munoz adduced, including evidence that the witness statements were procured by torture. It contends that the scope of review in an extradition proceeding is limited, and that evidence that requires the extradition court to weigh proof or judge competing claims of credibility is inadmissible. As respects Munoz's CAT claim, the government argues that this claim is not ripe for decision, as the Secretary of State has not yet ordered Munoz's extradition. The government also asserts that the court lacks jurisdiction to consider Munoz's CAT claim in this habeas proceeding.

### B.    The Government's Evidence

Most of Munoz's arguments address the evidence Judge Wistrich considered in deciding that he was extraditable, and the evidence he found to be inadmissible. In seeking extradition, the government relied on the statements of five witnesses; all of the statements were provided to Mexican law enforcement officials and district attorneys. The individuals providing the statements were:

(1) Dignora Hermosillo Garcia ("Hermosillo"), one of the kidnap victims, who described the kidnaping and identified one of its participants, Rosas;

(2) Roberto Castellanos Meza ("Castellanos"), Hermosillo's husband and the father of K.C.H. and C.J.C.H., who described events before and after the kidnaping;

(3) Benigno Andrade Hernandez ("Andrade"), who testified that he witnessed planning for the kidnaping and who was allegedly invited by two individuals – whom he identified as Munoz and another conspirator – to help them pull a "job;"

(4) Jesus Servando Hurtado Osuna ("Hurtado"), one of the conspirators, who incriminated himself, Munoz, Rosas, and two other individuals and said they were the planners of and participants in the kidnaping; and

(5) Fausto Librado Rosas Alfaro ("Rosas"), another conspirator, who implicated

---

[13]Amended Petition at 4.

3

himself, Hurtado, and Munoz, and corroborated Hurtado's version of events.[14]

The statements contain information inculpating Munoz and linking him to the crimes in question. All of Andrade, Hurtado, and Rosas directly connect Munoz to the kidnaping. Hurtado and Rosas, however, also gave statements subsequent to the statements on which the government relies. In the later statements, Hurtado and Rosas asserted that their earlier statements had been procured by subjecting them to extended periods of torture. Specifically, they said that they had been held captive and subjected to various forms of physical and psychological punishment until they signed statements inculpating themselves and Munoz.

### C. Munoz's Evidence

Munoz also proferred evidence in the proceeding before Judge Wistrich. Among other things, he submitted declarations by Hurtado and Rosas that offered further details concerning the circumstances under which they gave inculpatory statements to law enforcement, and that described the torture to which they had been subjected.[15] Munoz also submitted a declaration stating that his confession to the crime had been extracted through torture at the hands of the Mexican police.[16] He also proffered evidence suggesting that he, Hurtado and Rosas may have had alibis for the time at which the alleged crimes occurred. Specifically, Munoz adduced evidence that he was in California and Jalisco when the crimes were committed; that Hurtado was performing carpentry work on a house; and that Rosas was in California and Sonora.[17] Munoz also proffered evidence that Rosas's lawyer, a Mr. Bereshit, deceived him into signing an incriminating statement, and may have been colluding with prosecutors to inculpate Rosas and other alleged members of the conspiracy.[18]

In addition to this evidence, Munoz submitted the declarations of Jorge Gonzalez Lopez

---

[14]Order Certifying Extraditability at 8. Munoz submitted these statements with his petition. See Volume I (Exhibits 1-31) in Support of Supplement to Petition for Writ of Habeas Corpus by a Person in Federal Custody ("Munoz's Evidence"), Docket No. 15 (Aug. 31, 2011), Exh. 1 ("Andrade Statement"), Exh. 2 ("Hermosillo Statement"), Exh. 3 ("Add'l Hermosillo Statement"), Exh. 4 ("Castellanos Statement"), Exh. 5 ("First Hurtado Statement"), Exh. 6 ("Second Hurtado Statement"), Exh. 7 ("Chavez Sanchez Decl."), Exh. 8 ("Hurtado Statement"); Exh. 12 ("Munoz Detainment Report"); Exh. 14 ("Munoz Statement"); Volume II (Exhibits 32-68) in Support of Supplement to Petition for Writ of Habeas Corpus by a Person in Federal Custody ("Munoz's Evidence"), Docket No. 16 (Aug. 31, 2011), Exh. 42 ("Lopez Chavez Statement").

[15]Munoz's Evidence, Exhs. 9-11, 14.

[16]*Id.*, Exhs. 13, 58, 59.

[17]*Id.*, Exhs. 14-21, 22, , 24, 27-31, 60-64.

[18]*Id.* Exhs. 11, 32-40.

4

Chavez and Rosa Esthela Lopez Mendivil, two other members of the alleged conspiracy. In his declaration, Lopez Chavez stated that he had been held in police custody for 24 hours, during which period law enforcement officials had attempted to extract a confession from him using torture.[19] Mendivil was implicated in the conspiracy by one of the other conspirators, but the formal accusation against her was eventually revoked due to lack of proof.[20]

Finally, Munoz submitted evidence that his family members and legal advisors are being threatened with torture.[21]

## II. DISCUSSION

### A. Legal Standard Governing Extradition Hearings

"Extradition from the United States is initiated when the nation seeking extradition makes a request directly to the State Department." *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. 2006) (citing *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1207 (9th Cir. 2003)). "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney . . . files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." *Blaxland*, 323 F.3d at 1207. "Upon the filing of a complaint, a judicial officer issues a warrant for an individual sought for extradition, provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty." *Vo*, 447 F.3d at 1237 (citing 18 U.S.C. § 3184 (2008)). "After the warrant issues, the judicial officer conducts a hearing to determine whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' or, in other words, whether there is probable cause." *Vo*, 447 F.3d at 1237 (citing *Blaxland*, 323 F.3d at 1208).

"The authority of a[n] . . . extradition judicial officer is thus limited to determining an individual's eligibility to be extradited, which he does by ascertaining whether a crime is an extraditable offense under the relevant treaty and whether probable cause exists to sustain the charge." *Vo*, 447 F.3d at 1237 (citing *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005)). Stated differently, an extradition judge's authority is "limited to whether: 1) the extradition judge had jurisdiction to conduct proceedings; 2) the extradition court had jurisdiction over the fugitive; 3) the extradition treaty was in full force and effect; 4) the crime fell within the terms of the treaty; and 5) there was competent legal evidence to support a finding of extraditability." *Zanazanian v. United States*, 729 F.2d 624, 625-26 (9th Cir. 1984). See also *Cornejo-Barreto v. Seifert*, 218 F.3d 1004,

---

[19]*Id.*, Exhs. 42-43.

[20]*Id.*, Exhs. 20, 69.

[21]*Id.*, Exhs. 40-55. This evidence was also offered in support of Munoz's CAT claim.

5

1009 (9th Cir. 2000) ("*Cornejo-Barreto I*")[22] ("The purpose of the hearing before the magistrate or judge is to determine whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge").

If these requirements are met, the magistrate judge is "required to certify the individual as extraditable to the Secretary of State and to issue a warrant." *Prasoprat*, 421 F.3d at 1012 (citation omitted). "After an extradition judge certifies that an individual can be extradited, it is the Secretary of State, representing the executive branch, who ultimately decides whether to surrender the fugitive to the requesting country." *Vo*, 447 F.3d at 1237 (citing *Blaxland*, 323 F.3d at 1208, and *Quinn v. Robinson*, 783 F.2d 776, 789 (9th Cir. 1986)).

### B.    Legal Standard Governing Habeas Review of Extradition Orders

"[A] habeas petition is the only available avenue to challenge an extradition order." *Vo*, 447 F.3d at 1240 (citation omitted). The petition can challenge detention by the government if it is in violation of the Constitution, laws or treaties of the United States. See 28 U.S.C. § 2241(c)(3).

"The district court's habeas review of an extradition order is limited to whether: (1) the extradition magistrate had jurisdiction over the individual sought, (2) the treaty was in force and the accused's alleged offense fell within the treaty's terms, and (3) there is 'any competent evidence' supporting the probable cause determination of the magistrate." *Vo*, 447 F.3d at 1240 (citations omitted). "The scope of habeas corpus review in extradition cases is a limited one, according due deference to the magistrate's initial determination." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The purely factual findings of a magistrate judge hearing an extradition proceeding are reviewed under the clearly erroneous standard, while mixed determinations of fact and law,[23] and pure questions of law are reviewed *de novo*. See

---

[22]*Cornejo-Barreto I* has an unusual subsequent history. The decision was overruled by *Cornejo-Barreto v. Seifert*, 379 F.3d 1075 (9th Cir. 2004) ("*Cornejo-Barreto II*"). *Cornejo II*, in turn, was subsequently vacated as moot by *Cornejo-Barreto v. Seifert*, 389 F.3d 1307 (9th Cir. 2004) (en banc) ("*Cornejo-Barreto III*"). The *en banc* court refused to vacate *Cornejo I*, even though the government requested it. See *Cornejo-Barreto III*, 389 F.3d at 1307. Recently, however, the Ninth Circuit expressly overruled *Cornejo-Barreto I* to the extent that it "previously implied greater judicial review of the substance of the Secretary's extradition decision other than compliance with her obligations under domestic law." *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir. 2012) (en banc).

[23]Whether mixed questions of law and fact are to be treated as questions of law or of fact for purposes of appellate review has often "turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." See *Miller v. Fenton*, 474 U.S. 104, 114 (1985). "Other considerations often suggest the appropriateness of resolving close questions concerning the status of an issue as one of 'law' or 'fact'

*Quinn*, 783 F.2d at 791.   The court reviews Judge Wistrich's application of law *de novo*, but gives substantial deference to his factual findings, and will not disturb them unless they are clearly erroneous.

### 1.   "Contradictory" Versus "Explanatory" Evidence

"The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (citations omitted). See also *Barapind v. Enomoto*, 400 F.3d 744, 752 (9th Cir. 2005) (per curiam) (en banc) (stating that facts that may not comprise proof beyond a reasonable doubt can provide competent evidence supporting a finding of probable cause); *Cleugh v. Strakosch*, 109 F.2d 330, 333 (9th Cir. 1940) ("the sole question . . . is [ ] whether there was any evidence warranting the finding that there was reasonable or probable cause to believe appellee guilty – not whether such evidence was sufficient, but whether there was any such evidence").

"An extradition hearing does not require a higher standard of evidence than a probable cause hearing. . . .   The special and limited nature of extradition hearings is manifested in a more lenient standard for admissibility of evidence." *United States v. Lui Kin-Hong*, 110 F.3d 103, 120 (1st Cir. 1997). "The evidence may consist of hearsay, even entirely of hearsay." *Id.* (citing *Collins*, 259 U.S. at 317). "Extradition courts 'do not weigh conflicting evidence' in making probable cause determinations." *Barapind*, 400 F.3d at 750 (citing *Quinn*, 783 F.2d at 815). "The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate." *Quinn*, 783 F.2d at 815. "Because the magistrate[ judge]'s probable cause finding is thus not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues, it must be upheld if there is any competent evidence in the record to support it." *Id.* at 791.

"The court has limited discretion in determining what evidence to admit in opposition to an extradition request." *In re Strunk*, 293 F.Supp.2d 1117, 1122 (E.D. Cal. 2003).   After the nation seeking extradition produces evidence sufficient to meet its burden, "a fugitive facing extradition can present his own evidence to *explain away* the requesting government's evidence of probable cause." *Barapind*, 400 F.3d at 749 (emphasis added). The case law distinguishes, however, between evidence that "explains away" probable cause, and "evidence that merely controverts the existence of probable cause, or raises a defense. . . ." *Mainero v. Gregg*, 164 F.3d 1199, 1207 n. 7 (9th Cir. 1999); see also *Barapind*, 400 F.3d at 749 (excluding "conflicting evidence, the credibility of which could not be assessed without a trial"); *Republic of France v. Moghadam*, 617 F.Supp.777, 781-82 (N.D. Cal.

---

in favor of extending deference to the trial court.   When, for example, the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court and according its determinations presumptive weight." *Id.*

7

1985) ("While the accused may produce evidence to explain matters, the court may exclude evidence which merely contradicts government testimony, poses conflicts of credibility or establishes a defense"). See also *Collins*, 259 U.S. at 315-16 (permitting testimony that would "have explained ambiguities or doubtful elements in the prima facie case made against [petitioner]," but upholding the exclusion of evidence "related strictly to the defense").

The parties dispute where the line is drawn between "explanatory" evidence and "conflicting" evidence. "Courts have struggled to clarify the distinction." *Moghadam*, 617 F.Supp. at 782; see also *Strunk*, 293 F.Supp.2d at 1122 ("The distinction between evidence which 'explains' and evidence which 'contradicts' seems metaphysical"); *In re Extradition of Singh*, 170 F.Supp.2d 982, 994 (E.D. Cal. 2001) ("In practice, the standard is extremely difficult to apply"). As noted, the bulk of Munoz Santos's evidence consists of statements by key witnesses recanting prior incriminating statements, and offering evidence that the original statements were procured through torture or duress. These statements, if admissible, undermine the evidence on which the government relies to meet its burden.

The Ninth Circuit has not explicitly addressed whether recantation evidence is "explanatory" or "conflicting." It declined to answer this question in *Mainero*, and later in *Cornejo-Barreto I*, since the magistrate judges in those cases considered the recantation evidence but nonetheless certified that the petitioners were extraditable. See *Mainero*, 164 F.3d at 1207 n. 7 ("[W]e need not reach the question whether recantation evidence is admissible in an extradition hearing"); see also *Cornejo-Barreto I*, 218 F.3d at 1004 (noting that the magistrate judge had "considered the sufficiency of the evidence without the challenged confessions," but nonetheless concluded that probable cause existed).

*Barapind*, however, could be read to address the question obliquely. As a result, both parties rely on different passages from that opinion to support their arguments here. In *Barapind*, the Ninth Circuit suggested that an extradition judge was categorically barred from considering recantation evidence, while simultaneously sanctioning a point-by-point analysis as to whether the recantation testimony had greater indicia of reliability than the inculpatory statement. Barapind challenged all of the evidence the government submitted, which included various statements identifying him as the person who had committed certain crimes. *In re Extradition of Singh*, 170 F.Supp.2d at 1000-13.[24]

---

[24]*Barapind* was captioned *In re Extradition of Singh* in the district court, and the citation above is to the district court's order certifying extradibility. The district court's extradition order contains a detailed description of the facts and the evidence the Indian government proffered in support of extradition. The order certifying extradibility issued on September 18, 2001, after which Barapind filed a habeas petition challenging the order. The court held a hearing on that petition and ultimately denied it. Barapind then appealed. *Barapind v. Enomoto*, 360 F.3d 1061 (9th Cir. 2004). Judge Wanger of the Eastern District of California appears to have issued both the extradition order and the order denying Barapind's subsequent habeas petition.

On appeal, the Ninth Circuit's review of the decision on habeas focused on the extradition court's factual findings and legal conclusions, as well as its exclusion of certain types of evidence. It reversed the habeas court's decision in part, concluding that one of the alleged crimes that provided

He argued that the testimony against him was "unreliable because it was fabricated or obtained by torture." *Id.* at 748. Rejecting that argument, the *Barapind* court noted that the extradition judge had conducted "a careful, incident-by-incident analysis as to whether there was impropriety on the part of the Indian government," had concluded that the inculpatory statements were not the product of torture, and had found that they were reliable. 400 F.3d at 749 (referring to FIRs 100, 89, and 34).[25] The court's statement nonetheless suggests that evidence of torture or fabrication could be relevant in assessing the reliability of the government's evidence.

Addressing one of the specific charges, however, the *Barapind* court categorically upheld the exclusion of evidence that the government's inculpatory witnesses had recanted their statements. It stated that the extradition court properly "concluded[ ] that 'the credibility of [the] recantation [could not] be determined without a trial,'" which would exceed the limited mandate of an extradition court in making a determination of probable cause, as opposed to ultimate guilt." *Id.* at 749; see also *id.* (concluding that the "more recent affidavit constituted conflicting evidence"). This part of the decision strongly suggests that an extradition judge cannot consider recantation evidence since it requires the weighing of two contradictory statements.

The seeming tension between these portions of the *Barapind* decision can be resolved by examining the decision of the extradition court in that case. As noted, the Ninth Circuit referenced that court's factual findings that the government's evidence as to FIRs 100, 89, and 34 was supported by probable cause. *Id.* at 749. In certifying extraditability as to those crimes, Judge Wanger addressed Barapind's argument that he should take into account a range of evidence that purportedly explained away the government's submission. In considering FIR 100, Judge Wanger reviewed recantation statements, and held that "[t]he evidentiary dispute over the motives, bias, and totality of circumstances surrounding [the] original statements of Makhan Ram and Kulwant Singh, alleged recantations, actual recantations, and coercive conditions under which the recantations were taken, cannot be resolved in this extradition proceeding. . . . [T]he competence of India's probable cause evidence requires a trial to resolve the existing material credibility disputes." *In re Extradition of Singh*, 170 F.Supp.2d at 1025. Similarly, with regard to FIR 34, he reviewed recantation evidence and held that he could not make "a credibility decision . . . about the allegedly obliterating 2001

_____

a basis for certifying extraditibility may have been a "political offense" beyond the purview of the extradition treaty between India and the United States. *Barapind*, 400 F.3d at 752-53. The Ninth Circuit did not disturb the extradition court's evidentiary rulings, however.

[25]A FIR is the document that contains the criminal charge against an individual in India. *Singh*, 170 F.Supp.2d at 987.

The original three-judge panel in *Barapind* similarly declined to overturn the district court's findings, but notably did not say that the extradition court had improperly considered Barapind's evidence in the first place. It only rejected the notion that "torture, forced confession, and unreliable evidence . . . should negate probable cause as to *the entire body* of India's evidence." 360 F.3d at 1070 (emphasis added).

affidavit of Nirmal without further evidence and a hearing. . . ." Ultimately, Judge Wanger found that "a trial [would be] required to resolve these evidentiary conflicts and decide who is telling the truth. Th[e] charge is not obliterated or explained away." *Id.* at 1027.

As respects FIRs 100 and 34, Barapind did not submit evidence that the allegedly incriminating statements had been procured through torture. He did submit such evidence concerning FIR 220, however. The incriminating statement regarding that charge had been made by Barapind's alleged accomplice. Barapind submitted three affidavits by individuals who had observed the accomplice being tortured in police custody. *Id.* at 1029. Judge Wanger noted that "[p]robable cause cannot be based on evidence procured by torture, which is incompetent if obtained by unlawful means," and excluded the incriminating statement as evidence of torture undermined its credibility. *Id.* It was this careful "incident-by-incident" analysis – i.e., the differing treatment accorded FIRs 100 and 34, on the one hand, and FIR 220, on the other – that the Ninth Circuit approved in *Barapind*. 400 F.3d at 749.[26]

For this reason, the court concludes that both parties use the term "recantation evidence" too broadly in construing *Barapind*, and fail to distinguish between two discrete types of evidence. To the extent an individual offers a later statement that directly contradicts an earlier incriminating statement, an extradition court cannot consider the later statement, as to do so would place it in the position of weighing the credibility of the two statements and determining which one is more believable. *Barapind* strongly suggests that such evidence is inadmissible. 400 F.3d at 749-50 ("Because extradition courts 'do[ ] not weigh conflicting evidence' in making their probable cause determinations, we find no basis for overturning the extradition court's decision that probable cause of Barapind's guilt existed. . ." (internal citation omitted)). Considering such evidence inherently places the court in the position of determining which account is more credible – the original inculpatory confession, or the later recantation. The very purpose of recantation evidence is to undercut the government's version of the facts, not to explain it away.

Multiple district courts have so held. See *In re Solis*, 402 F.Supp.2d 1128, 1131 (C.D. Cal. 2005) ("Salazar challenges the statement made by Rosendo Ontiveros inculpating Salazar and argues that Rosendo Ontiveros later stated that he had no idea what he signed, that he was forced to sign the statement, and that he was told that he would be killed if he came to the United States to testify on

---

[26]The government dismisses the Ninth Circuit's reference to "incident-by-incident analysis" as dicta. It argues that, while the extradition court improperly considered evidence of torture, its error was "harmless" because it concluded that the government had established probable cause. (Opp. at 31.) The court does not believe the reference is so easily ignored, however. The extradition court explicitly considered evidence of torture and incorporated it in its factual findings. The Ninth Circuit reviewed those findings for clear error and did not indicate in any way that the extradition court's consideration of torture evidence was *legal* error. 400 F.3d at 748. This difference distinguishes *Barapind* from *Cornejo-Barreto I* and *Mainero*, where similar questions were presented and the court explicitly declined to decide them.

Salazar's behalf. But a fugitive in international extradition proceedings is not permitted to introduce evidence that contradicts the evidence submitted by the requesting country"); *In re Extradition of Powell*, 4 F.Supp.2d 945, 957 (S.D. Cal. 1998) (denying an accused's request to present evidence to show the unreliability of the government's evidence and a duress defense, because "[r]ebuttal, presentation of contradictory evidence, and examination or cross examination of witnesses [is] not appropriate in this setting," and permitting the accused to present such evidence would result in a "minitrial"); *Matter of Extradition of Garcia*, 890 F.Supp. 914, 922-23 (S.D. Cal. 1994) ("Evidence that conflicts with that submitted on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the demanding country's witnesses. Also, extradition treaties do not contemplate the introduction of testimony of live witnesses by the respondent to contradict the demanding country's proof" (internal citations omitted)); *Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) (holding that petitioners were not entitled to "go 'behind' an affidavit to depose affiants in the expectation of producing evidence bearing on reliability or credibility. Indeed, were defendants to do so the Court would be faced with making a determination of reliability and credibility from affidavits and deposition transcripts "). Cf. *Collins*, 259 U.S. at 316 (affirming the exclusion of evidence bearing on petitioner's defense to avoid compelling a foreign government "to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and [precluding it from] obtain[ing] extradition until after it had procured a conviction of the accused upon a full and substantial trial here").

Evidence that an earlier statement was procured by torture, however, is of a different character. Such evidence is not inherently "contradictory," since it does not present a different version of the facts from that presented by the extraditing government. As the United States itself puts it: "The simplest way to understand the distinction [between contradictory and explanatory evidence] . . . is to ask whether the requesting country's proof and a fugitive's proffered evidence present mutually exclusive versions of the truth."[27] Evidence that a statement was procured through torture does not present an alternate version of events, or factually contradict the government's probable cause narrative. Instead, it addresses the reliability of the incriminating statements the government has presented and questions their competence.

Stated differently, the incriminating statements at issue in this case recite that "A, B, and C happened." A, B and C incriminate Munoz. To the extent the declarants made later statements saying that "A, B, and C *never* happened; in actuality, D, E and F happened," those statements clearly contradict the government's narrative and are inadmissible. To the extent the evidence suggests that the statements that A, B and C happened were procured through torture and under duress, however, they do not factually contradict the earlier statements, but call their reliability into question.

There is thus a critical distinction between recantation statements, on the one hand, and evidence that the government's evidence was procured through torture. This conclusion finds some

---

[27]Opp. at 10.

11

support in the decisions of other district courts that have examined the issue.   Cf. *Matter of Extradition of Mainero*, 990 F.Supp. 1208, 1226 (S.D. Cal. 1997) ("The suggestion of torture is certainly present in the record.  The thought of testimony coerced by torture is certainly abhorrent and inconsistent with [the] tenets of our society.  As a society we cannot suspend that concept by virtue of the interest of a foreign nation in the extradition of an United States citizen, the heinous nature of the offense notwithstanding.  However, before we can indict evidence as tainted by the coercive effect of torture, satisfactory evidence must be present.  Argument, inference and innuendo is all that has really been presented here. . . .  Ultimately, the Court concludes that there is no reliable evidence of torture or duress of the witnesses"); *Matter of Extradition of Contreras*, 800 F.Supp. 1462, 1468 (S.D. Tex. 1992) (stating that "[t]he Court has no doubt that the original statements were not given voluntarily," and admitting evidence that incriminating statements were procured through torture or duress); see also *In re Atuar*, 300 F.Supp.2d 418, 431 (S.D.W. Va. 2003) ("A statement of a relator's alleged accomplice or coconspirator recanting an earlier statement inculpating relator is contradictory and therefore not admissible in extradition proceedings.  If it is evident, however, that the inculpating statement was coerced and not made voluntarily, the recanting statement is admissible, and consideration is given to which of the statements is more reliable in view of the totality of the evidence"), aff'd, 156 Fed. Appx. 555 (4th Cir. Nov. 23, 2005) (Unpub. Disp.).

While certain of these courts conflated recantation and torture evidence in the same manner the parties do here, they nonetheless focused on the effect evidence of torture has on the reliability of inculpatory statements.  See *Atuar*, 300 F.Supp.2d at 431 ("Where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane in an extradition proceeding. . . .  The essential question is whether the indicia of reliability is on the recantation or the initial statement"); *Contreras*, 800 F.Supp. at 1469 ("Obviously, where the indicia of reliability is on the prior inculpating statement, then a recantation, if admitted, would not negate the existence of probable cause; or if the recantation only controverted a prior inculpating statement, then it would not rebut the probable cause evidence.  However, where a prior statement is shown to be coerced and the indicia of reliability is on the recantation, then the subsequent statement negating the existence of probable cause is germane").

The crucial difference between torture evidence and "contradictory" evidence is that the former is relevant in assessing the reliability of the witnesses on whom the government relies to make its probable cause showing.  While extradition courts cannot weigh conflicting evidence, evidence of torture does not require such weighing.  Evidence of torture addresses the circumstances under which the government's witnesses made inculpatory statements; an extradition court properly considers evidence of torture, duress, or unlawfully procured confessions in deciding the reliability of the government's evidence.  Whether the inculpatory statement or the recantation is the more credible is not a decision the extradition court can make.  It can, however, determine that torture or other forms of duress render the government's inculpatory evidence unreliable.[28]

---

[28]Although the distinction between reliability and credibility is often hard to discern, courts must make a similar distinction when deciding the admissibility of expert testimony.  See FED.R.EVID. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or

The distinction is also consistent with the holding in *Eain v. Wilkes*, 641 F.2d at 511-12, on which the government heavily relies. There, petitioner proffered recantation evidence, which included declarations that prior incriminating statements had been made under the "mistaken belief that petitioner could not be harmed by the statements because he was outside the country." The opinion did not describe the evidence at issue in any greater detail. 641 F.2d at 511. The Seventh Circuit concluded that the statements did not "explain [away] the government's evidence, [but] rather . . . tend[ed] to contradict or challenge the credibility of the facts implicating petitioner in the bombing." *Id. Eain* thus holds that to the extent recantation evidence contradicts or retracts prior statements and offers a factually different narrative than those statements, it is not admissible. There is no suggestion that the evidence the *Eain* court held was properly excluded was evidence that a government statement had been procured through duress or torture, however, or that it was otherwise unreliable. Since that is one of the issues here, the case is, to that extent, inapposite.[29]

---

education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"); see also *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir. 1987) ("[T]he weakness in the underpinnings of [expert] opinions may be developed upon cross-examination," because "such weakness goes to the weight and credibility of the testimony" as opposed to its admissibility (internal quotations and citation omitted)); *McClellan v. I–Flow Corp.*, 710 F.Supp.2d 1092, 1101 (D. Or. 2010) ("[E]stablishing reliability should not mean that plaintiffs 'have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable,'" quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994).

[29]In reaching this conclusion, the court does not adopt Munoz's interpretation of the word "obliterate" in *Mainero* and *Barapind*. In an attempt to broaden the scope of evidence an extradition court can consider, Munoz argues that any evidence that "obliterates" probable cause is admissible. He does not clearly articulate the standard he proposes, however, and does not address the fact that it would essentially erase the settled distinction between "explanatory" and "contradictory" evidence. Probative evidence that undermines the reliability of the government's showing of probable cause could "obliterate" that showing, but so too could overwhelmingly strong contradictory evidence. See MERRIAM-WEBSTER DICTIONARY (defining "obliterate" as "to destroy utterly all trace, indication, or significance of . . ."). Indeed, petitioner appears to argue that if certain types of otherwise inadmissible evidence accumulate to some undefined level, such that the evidence completely overwhelms and thus negates the government's evidence, the contradictory evidence becomes admissible.

The court discerns no legal basis for this suggested rule. Reading *Mainero* and *Barapind* closely, it is clear that they did not intend to adopt an expansive reading of the term, and that they were simply applying the well-settled standard that explanatory evidence is admissible, but contradictory evidence is not. See *Barapind*, 400 F.3d at 749 ("Generally, *evidence that explains*

13

2.    **Application of the Evidentiary Standard to the Evidence in Question**

The conclusion that evidence of torture was properly admissible at the extradition hearing does not end the inquiry, however. This case comes before the court on collateral review of the extradition court's ruling, not direct appeal. Courts have held that if the habeas court concludes that the order of the extradition court was based on an error of law, it has discretion to "remand" the matter to the extradition judge for further proceedings. See *Sandhu v. Burke*, No. 97 Civ. 4608(JGK), 2000 WL 191707, *17 (S.D.N.Y. Feb. 10, 2000) ("The Court of Appeals has on several occasions endorsed, at least under certain circumstances, the practice of a habeas court remanding for further hearings by an extradition court"); see also *Gill v. Imundi*, 747 F.Supp. 1028, 1050 (S.D.N.Y. 1990) (remanding to the extradition court for a determination as to whether probable cause existed after the exclusion of inadmissible evidence).

The case law is also clear, however, that a habeas court must affirm the extradition court's ruling if "'*any* competent evidence' support[s] the probable cause determination of the magistrate." *Vo*, 447 F.3d at 1240 (citing *Mainero*, 164 F.3d at 1205) (emphasis added); see also *Quinn*, 783 F.3d at 790 (stating that review is limited to "whether there was *any evidence* warranting the finding that there was reasonable ground to believe the accused guilty" (citation and quotation omitted, emphasis added)). The record in this case discloses a more than sufficient basis to affirm the extradition order. Specifically, while the court believe that distinguishing between evidence of torture and "recantation" evidence properly applies Ninth Circuit precedent and reconciles divergent case law on the subject, it appreciates that applying that standard to a given set of facts is not a process that is free of ambiguity or doubt. Cognizant of that fact, and having reviewed the evidence the government and Munoz adduced, the court cannot say that the extradition court improperly excluded evidence related to the torture of witnesses who provided inculpatory statements.

As an initial matter, the fact that evidence of torture or duress can be admitted because it addresses the reliability of the government's evidence does not mean that *all* evidence concerning torture is admissible. The extradition court retains discretion to decide what the evidence to admit and what weight to give the evidence admitted. See *Quinn*, 783 F.2d at 815 ("The credibility of

---

*away or completely obliterates probable cause* is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible," quoting *Mainero*, 164 F.3d at 1207 n. 7 (emphasis added)); *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978) ("Participation by the fugitive at the extradition proceeding is limited; he is not permitted to introduce evidence on the issue of guilt or innocence but can *only offer evidence that tends to explain the government's case of probable cause*. Thus, the extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity" (internal citation omitted, emphasis added)); see also *Quinn*, 783 F.2d at 817 n. 41 ("Although the accused is not entitled to introduce evidence that goes to his defense, 'he may offer limited evidence to explain elements in the case against him,'" quoting *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962)).

14

witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate. The magistrate was free to determine the weight to be accorded to the various descriptions of the killer" (citation omitted)); see also *Atuar*, 300 F.Supp.2d at 427 ("The Court has discretion within specific boundaries to admit and consider evidence on the issue of probable cause"); *In re Extradition of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y. 1978) ("The extent of such explanatory evidence to be received is largely in the discretion of the judge ruling on the extradition request").

At oral argument, the court suggested that it might be possible to distinguish between torture evidence and recantation evidence s outlined above. While the parties did not argue that drawing such a line would be impossible in every case, they agreed that drawing such a line in this case would be impossible. As explained below, the court's review of the evidence supports this conclusion.

a.   **Direct Evidence That Statements Incriminating Munoz Were Procured Through Torture**

The court begins with perhaps the most important items of evidence whose admissibility is in dispute. They fall into two categories: (1) statements adduced by the government suggesting that the Hurtado's and Rosas's incriminating statements were procured through torture, and (2) statements proffered by Munoz that corroborate and reinforce that suggestion.

i.   **Evidence Presented by the Government**

Munoz's case is somewhat unusual in that much of the evidence that certain statements were procured through torture was proffered by the government in support of extradition. As noted, the government relied heavily on the statements of Hurtado and Rosas, who directly implicated Munoz (and several others) in the kidnaping. The government proffered three statements by Hurtado, given on October 12, 2005, March 14, 2006, and March 22, 2006, respectively.[30] The extradition court relied primarily on the March 14, 2006, statement, which directly implicated Munoz, Rosas, Lopez Chavez, and Mendivil as the individuals responsible for the kidnaping.[31] The court did not address Hurtado's first statement, which contained a markedly different version of the facts.[32] It explicitly

---

[30]Amended Petition, Exh. 7.

[31]Extradition Order at 13-14.

[32]Amended Petition, Exh. 5. In the March 14, 2006 statement, Hurtado claimed that he had entered into a conspiracy with several other individuals to rob a house located in Tepic, Nayarit, which was owned by wealthy people and was thought to contain valuable items. (*Id.*) Two of the purported co-conspirators were identified as "El Sapo" and "El Chonte." (*Id.*) Although the statement is unclear in some respects, Hurtado reported that El Sapo directed him to wait until 10 p.m. on the day of the planned robbery, and then come to the house that was to be robbed. (*Id.*) When he arrived, he saw El Sapo driving a truck towards the house. Hurtado departed and went to

15

excluded Hurtado's March 22, 2006, statement, which he gave during his first court appearance, and in which he stated that he had made the March 14, 2006 statement only after being kidnaped, held captive for twelve days and tortured.

Rosas gave two statements.  He provided the first on March 27, 2006, under police questioning, and implicated himself, Hurtado, Lopez, Mendivil, and Munoz.[33]  Two months later, on May 25, 2006, Rosas was brought before a court and given an opportunity to accept, reject, or alter his March 2006 statement.[34]  Rosas stated that he had provided the earlier statement while he was being tortured, and that the police had made threats against his family.[35]  The extradition court relied only on the first statement and excluded the second.

The government proffered a public prosecutor's sworn affidavit stating that despite Hurtado's and Rosas's assertion that they were tortured, they remain detained as the judges in their cases determined that there was sufficient evidence to hold them.[36]  He stated that neither Hurtado nor Rosas filed a complaint with the prosecutor or the "Human Rights Commission" stating that they had been tortured, and that medical and psychological examinations conducted of both individuals revealed no evidence of "bodily injury or mental disorder."[37]  The prosecutor asserted that no evidence supports Hurtado's and Rosas's torture claims, and that their recantations are likely a mere defense strategy.[38]

Hurtado's and Rosas's incriminating statements are critical to the probable cause analysis, since they are the only witnesses that directly link Munoz to the kidnaping.  The extradition court's probable cause determination relies on their statements, and concludes that facts in the remaining statements corroborate or lend credence to Hurtado's and Rosas's confessions.[39]  Although the

---

purchase some cocaine. (*Id.*) As he returned to the house, he was stopped by a roadblock of cars. Men dressed in civilian clothing got out of the cars, and began to question him about "the truck." (*Id.*) Hurtado identified a man in a photograph as "Jose Luis." (*Id.*) Hurtado's March 22, 2006, statement, by contrast, asserted that he had entered into a conspiracy with Lopez Chavez, Rosas, and Munoz to kidnap Dignora Hermosillo. (Amended Petition, Exh. 6.) His role was to keep watch on the house where the kidnaping was to take place. (*Id.* at 5.)

[33] Amended Petition, Exh. 8.

[34] *Id.*, Exh. 7.

[35] *Id.*

[36] Amended Petition, Exh. 7 at 6.

[37] *Id.* at 7-8.

[38] *Id.* at 8-9.

[39] Extradition Order at 19.

16

government also relied on Hermosillo's, Castellanos's, and Andrade's statements, none of them specifically identified Munoz as a participant in the kidnaping of the child. Andrade stated that he went for a drink with Rosas and Munoz, and that Rosas asked him in Munoz's presence whether he would be interested in pulling an unspecified "job." Andrade declined to participate.[40] Hermosillo, for her part, identified Rosas as one of her kidnapers based on police photographs; while she did not directly identify Munoz as a participant, the extradition court concluded that her identification of Rosas lent credibility to his statement incriminating Munoz.[41]

---

[40]Amended Petition, Exh. 1 at 3. Judge Wistrich's order states that Andrade testified that the job in question was "in reference to a kidnaping for ransom," Extradition Order at 21, but the actual statement refers only to a job that would require asking an individual named "Beto" for two million pesos. (Amended Petition, Exh. 1 at 3.) Andrade only stated that when he later heard about Hermosillo's kidnaping and the death of one the daughters, he wondered whether Munoz and Rosas had succeeded. (*Id.*)

[41]At the hearing, the government argued that even if Hurtado's and Rosas's statements were not considered, the court could affirm the extradition court's order on the basis of Castellanos's, Hermosillo's, and Andrade's testimony alone. There is no evidence in the record that the testimony of any of the latter three individuals was procured through torture or duress. Nor did Munoz attempt to introduce evidence directly controverting their statements, although he questioned the reliability and weight of their testimony. Accordingly, their statements are unaffected by the evidentiary issues addressed above.

Although the question is close, the court concludes that these statements do not provide an adequate basis for affirming the extradition court's order. Hurtado's and Rosas's testimony is the centerpiece of the government's case, because they were the only individuals who directly implicated Munoz in the kidnaping. The extradition court too relied heavily on their statements in his probable cause analysis, and addressed the remaining witness's statements only to the extent they provided circumstantial support for Hurtado's and Rosas's incriminating statements.

A review of the government's evidence explains why this is so. First, Castellanos never saw any of the participants in the kidnaping and can offer no testimony connecting Munoz to the crime. The most his testimony does is set the scene for the kidnaping; it adds no weight to the government's showing of probable cause. Indeed, the extradition court's order does not mention Castellanos's statement in its probable cause analysis.

Second, neither Hermosillo nor her husband directly implicated Munoz in any of the alleged crimes. As the extradition court observed, the probative value of Hermosillo's testimony was that it supported *Rosas's* inculpatory statements and his testimony that Munoz was involved. (Extradition Order at 25.)   Without Rosas's testimony, the probative value of Hermosillo's evidence is significantly decreased; standing alone, it does not support a finding of probable cause. Additionally, the extradition court noted a number of problems with Hermosillo's identification, most particularly that she observed one of the kidnapers had a mole on his face, while Rosas had no such distinctive features. (*Id.* (acknowledging that petitioner had raised "legitimate concerns" with Hermosillo's identification.) While it nonetheless deemed Hermosillo's identification reliable, the fact remains that

17

Munoz argues that this is not a case in which he presented conflicting evidence, but rather one

the most the identification does is connect Rosas to the crime, not Munoz.

The only witness who directly implicated Munoz in any suspicious activity was Andrade. The extradition order examined Andrade's testimony in detail. He gave a statement in January 2006 to a district attorney in Tepic in which he said that an unidentified man had approached him and asked whether he knew anything about the death of a little girl in August 2005. (Extradition Order at 11.) He said that after being pressured, he told the individual that in July or August 2005, he was approached by "El Pepe" and "El Chilango" about taking part in an unspecified "job" at some later date. (*Id.* at 12.) He agreed to go out for a drink with the men, and one said that "Beto" was the target of "the job," and that they hoped to get 20 million pesos from him. El Chilango said Beto was from Nayarit. Andrade did not want to do the job, and heard nothing further about it. (*Id.*) Shown photographs of the alleged conspirators, he identified El Pepe as Munoz, and El Chilango as Rosas.

Alone, Andrade's statement is too vague to support a probable cause finding. He provided no specifics concerning the "job," and did not identify its target in any detail. While the government notes that "Beto" is a common nickname for "Roberto" – linking the name to Castellanos – Munoz counters that "Roberto" is itself a common name that could refer to any number of people. The extradition order relied on Andrade's statement primarily as circumstantial corroboration for Rosas's and Hurtado's statements. If their statements are not considered, the probative value of the statement is substantially less. (Extradition Order at 24.)

The government argues that Hermosillo provided a detailed description of the "corpus" of the crime and positively identified Rosas as one of her kidnapers. Andrade, in turn, linked Rosas to Munoz in the context of planning a "job" targeting Beto that was to net two million pesos. It asserts that Munoz's flight in both Mexico and the United States provides some inferential support as well. (Extradition Order at 26 (citing *Curreri v. Vice*, 77 F.2d 130, 132-33 (9th Cir. 1935) (stating that evidence of flight and assumption of fictitious name corroborated inculpatory testimony).) The mere fact that all of the evidence is circumstantial is not necessarily fatal to the government's ability to meet its burden. See *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007).

Without Hurtado and Rosas, however, the remaining witness's statements are too thin a reed on which to base a showing of probable cause. While in combination, it shows that there was probable cause to believe Rosas was involved in the crime, the same is not true of Munoz. At most, the evidence suggests that Munoz may have had information concerning the kidnaping, since he was an associate of Rosas. Just as Hermosillo's testimony serves only to implicate Rosas, Andrade's testimony suggests only that Rosas and Munoz were interested in committing some type of crime. It does not support the inference that they were planning to commit the kidnaping at issue *in this case*. See *In re Extradition of Gang-Choon Han*, No. CV 11-2059-DMG (MLG), 2012 WL 33201, *10 (C.D. Cal. Jan. 6, 2012) ("While circumstantial evidence may be enough to support a probable cause determination, the circumstances offered here are simply insufficient to do so. There is no evidence that Han was directly involved in the disappearance of the vehicles, as nothing suggests that Han had possession of them at the start of the relevant time period, was the only one with access to them, or had ever even used the vehicles himself. Nor is there any evidence that the vehicles were actually sold, as opposed to stolen or otherwise disposed of"). Accordingly, the court cannot affirm the extradition order on the basis of Castellanos's, Hermosillo's, and Andrade's testimony alone.

in which "the government itself presented conflicting evidence and [he] merely pointed out and analyzed the discrepancies."[42] Cf. *In re Strunk*, 293 F.Supp.2d at 1126-40 (reviewing the government's evidence and holding that it was "so inconsistent and conflicting that it provides little competent evidence" supporting extradition). The extradition court rejected this argument, concluding that the evidence submitted by the government should be treated just as would recantation evidence he submitted, as both require the extradition court to make a credibility determination or weigh evidence.[43]

In the court's view, the fundamental problem with the conflicting statements of Hurtaod and Rosas is not which party submitted it. It is that even if evidence related to Hurtado's and Rosas's torture is admissible, it is inextricably intertwined with their recantations. Their testimony can be summarized as follows: "I was tortured when I gave my inculpatory statements and I completely recant and contradict my earlier recitation of events." Given this, it is difficult, if not impossible, to distinguish between their statements regarding torture, on the one hand, and their recantation of the incriminating statements, on the other. Parsing the statements would almost certainly require the extradition court to determine whether the recantations are more reliable than the original inculpatory statements. As the extradition court noted, this would require the weighing of evidence and findings as to which version of events should be believed.

Judge Wanger's extradition order in *Singh* provides a useful comparison. As noted, he declined to admit evidence of the type at issue here, because it would have required him to weigh conflicting reports of relevant events. As respects FIR 220, however, the petitioner adduced evidence that did not directly contradict the factual assertions in the inculpatory statements made by a declarant. Specifically, he submitted the affidavits of three individuals who observed the torture, strongly suggesting that the evidence was "obtained by unlawful means." *Singh*, 170 F.Supp.2d at 1029. The country seeking extradition offered nothing to rebut the testimony. *Id*. The court also relied on circumstantial evidence regarding the Indian security forces' and local police's habit of using torture, reprisal killings, and extrajudicial detentions to extract confessions. *Id*. Thus, the evidence on which Judge Wanger relied did not require him to assess the relative credibility of two conflicting statements and decide which to believe. Instead, he was able to focus properly on whether the original inculpatory statements were obtained by reliable means.

Hurtado's and Rosas's later statements are fundamentally different. They are clearly recantations of the earlier inculpatory statements, and were they considered, they would inevitably require the extradition court to weigh conflicting versions of the facts. At the hearing, Munoz's

---

[42]Reply at 4.

[43]Extradition Order at 37 n. 12 (noting that court was "aware of no authority . . . that a recantation is admissible to demonstrate inconsistencies in the government's probable cause showing merely because it was included as part of the record in an extradition request where the government opposes its admission and does not rely on it").

counsel acknowledged that in this case, evidence of torture and recantation evidence are "inextricably intertwined." As a consequence, the court concludes that the extradition court properly excluded the evidence.

### ii.   Evidence Presented by Munoz

The above analysis applies equally to much of the evidence Munoz proffered. Munoz adduced the following evidence that statements incriminating him were procured through torture: (1) additional statements by Hurtado, (2) an additional statement by Rosas, and (3) his own declaration concerning the torture to which he was subjected.

Munoz proffered three additional statements by Hurtado. The first was given on May 25, 2006, at a hearing for another alleged conspirator, Mendivil.[44] In this statement, Hurtado reiterated that he had been beaten, had water poured into his nose and mouth, been threatened with death, and been subjected to other forms of torture.[45] When asked, however, he was unable to offer any evidence other than his testimony that supported his assertion.[46] Hurtado also made a statement in his own case on November 21, 2006, in which he further detailed the torture he had purportedly experienced.[47] Finally, Hurtado provided a declaration for Munoz's extradition proceeding that explained the discrepancies in the statements submitted by the government; he asserted that both the October 2005 and March 14, 2006 statements had been procured through torture.[48] Munoz also proffered a third statement by Rosas, in addition to the two presented by the government, which was dated June 20, 2006. Rosas made this additional statement at another court appearance in which he addressed his written confession. He described in greater detail the circumstances under which he confessed, and discussed torture and threats to his life and those of his family members.[49]

Like the recantations submitted by the government, considering this evidence would require the extradition court to weigh competing versions of events and decide which version to believe. Accordingly, they were properly excluded.

### b.   Evidence that Munoz Was Not Present at the Time of the Events in

---

[44]Amended Petition, Exh. 9.

[45]*Id.* at 3.

[46]*Id.* at 3-4.

[47]*Id.*, Exh. 59.

[48]*Id.*, Exh. 10. As respects his October 2006 statement, Hurtado stated that he had fabricated the incident and names in order to stop the beating. (*Id.*)

[49]Amended Petition, Exh. 11.

### Question

The court next considers other categories of evidence that Munoz attempted to introduce at the extradition proceeding. Munoz contends that the extradition court should have admitted evidence that he had an alibi for the time at which the kidnaping took place. As noted, courts have repeatedly held that such evidence is inadmissible. *Barapind*, 400 F.3d at 749; *Quinn*, 783 F.2d at 817 n. 41 ("Although the accused is not entitled to introduce evidence that goes to his defense, 'he may offer limited evidence to explain elements in the case against him'"); *Hooker*, 573 F.2d at 1368 ("[T]he extraditing court *properly may exclude evidence of alibi*, of facts contradicting the government's proof, or of a defense such as insanity" (internal citation omitted, emphasis added)).

Munoz argues that his alibi evidence "serves as corroboration" for the recantation evidence he has submitted;[50] evidence of Munoz's alibi, however, does not in any way address the torture Hurtado and Rosas claim to have experienced. His argument is merely an effort to evade the well-established rule that evidence supporting a defense is not admissible in an extradition proceeding. See *Desmond v. Eggers*, 18 F.2d 503, 506 (9th Cir. 1927) ("[T]estimony tending to show that the appellee was not in British Columbia on that date would necessarily tend to contradict the testimony of these witnesses. And in our opinion, whatever the rule may be in other cases, a foreign government should not be required to produce testimony before a committing magistrate in this country to rebut testimony tending to show that the accused was in the city of Seattle or elsewhere at the time of the commission of the crime"); *Powell*, 4 F.Supp.2d at 958-60 ("It is well settled that defenses are irrelevant to extradition hearings and should therefore not be considered"). Thus, the extradition court properly excluded this evidence as "contradictory."

### c.    The Acquittal of Mendivil

Munoz also sought to introduce evidence regarding Mendivil, another of the suspects implicated in the kidnaping. Mendivil was accused of participating in the crime, but gave a statement denying any knowledge of or involvement in the kidnaping.[51] She was nonetheless charged with the crime and imprisoned. On appeal, a Mexican court revoked the charge and ordered her release from prison, deeming the government's proof insufficient.[52]

Munoz adduces evidence that in the Mexican criminal judicial system, defendants are "essentially" presumed guilty until proven innocent.[53] Based on this rather vague statement, he

---

[50] Amended Petition at 41.

[51] Amended Petition, Exh. 69.

[52] *Id.*, Exh. 20.

[53] Amended Petition, Exh. 68 at 5. Munoz proffers a U.S. Department of State country report on Mexico, which states that while 2008 reforms instituted a presumption of innocence, "such rights

contends that the reversal of Mendivil's conviction demonstrates her innocence, and necessarily controverts statements made by Rosas and Hurtado implicating Mendivil in the crime. This contradiction, Munoz argues, supports the conclusion that Rosas's and Hurtado's recantations, rather than their initial incriminating statements, are accurate.

The court does not find this argument particularly persuasive. As an initial matter, Munoz has not adduced sufficient evidence that his characterization of the Mexican criminal justice system is accurate. He relies primarily on a U.S. Department of State country report on Mexico, and what appears to be a Department of State bulletin for U.S. citizens arrested in Mexico, intended to educate them about what they may expect. None of the cited evidence supports the broad conclusion that an appellate court's reversal of a conviction is necessarily equivalent to a finding that the defendant was innocent of the crime charged. More fundamentally, the fact that Mendivil's conviction was eventually overturned does not "explain away" the government's showing of probable cause concerning Munoz. Insofar as it is offered to bolster Hurtado's and Rosas's recantations, the court has concluded that the recantations are inadmissible. Any evidence offered to corroborate the recantations, therefore, is not relevant.

### d.    Munoz's Remaining Evidence

Given the legal standard the court has articulated and applied, whether or not Munoz's remaining evidence was admissible is a more complicated question. The evidence can be divided into three categories: evidence that another alleged co-conspirator, Jorge Gonzalez Lopez Chavez, was tortured in custody;[54] evidence that Rosas's purported lawyer, a Mr. Bereshit, intentionally deceived him and colluded with the government to induce Rosas to sign an incriminating statement;[55] and evidence related to torture Munoz himself experienced, as well as threats of torture against his family

---

are not provided for in jurisdictions that have not finished with reform implementation. . . ." (Munoz's Evidence, Exh. 57 at 14.)

[54]Amended Petition, Exh. 42. *Id.*, Exh. 43 ("Maria Teresa Decl."), ¶ 3. This affidavit – Lopez Chavez's sister – states that after Lopez Chavez returned home following his arrest, he told her that he had been tortured while in custody. Lopez Chavez said his face had been covered with a plastic bag, that water had been forced into his mouth, and that he was repeatedly beaten. (*Id.*) His sister reports that, approximately two months after his arrest, Lopez Chavez was once again arrested by the police, and has not been seen or heard from since. (*Id.*, ¶¶ 6-8.)

[55]Munoz's Evidence, Exh. 11 at 5-6. *Id.*, Exhs. 36, 40. Munoz also contends that Bereshit adduced evidence *against* Rosas in his own case, and suggests that Bereshit served as an assistant prosecutor in the case against Rosas. During Rosas's detention and alleged torture, Bereshit urged him to sign a written statement stating that he had participated in the kidnaping, and told him that Castellanos would have Rosas's family killed if he did not sign.

22

members and legal representatives in Mexico.[56]

The extradition court considered all of this evidence in the general category of "torture and recantation" evidence, and held it was inadmissible.[57]  The court has concluded that evidence of torture that does not directly contradict the facts presented by the government should not be excluded as a matter of law.  Cf. *Singh*, 170 F.Supp.2d at 1029 (holding that evidence of Indian law enforcement's regular practices of torture were admissible in extradition proceeding).

As noted, however, the court's scope of review on habeas is limited to whether "there is 'any competent evidence' supporting the probable cause determination of the magistrate [judge]." *Vo*, 447 F.3d at 1240 (citations omitted); see also *Eain*, 641 F.2d at 508 (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).  The court must accord due deference to the extradition court's determination that Rosas's and Hurtado's statements were both reliable and credible, as well as its decision to credit the statements of Castellanos, Hermosillo, and Andrade.  Much of the evidence Munoz has adduced, particularly that relating to him and Lopez Chavez, does not address whether Hurtado or Rosas were tortured in police custody.  Rather, it is largely intended to provide circumstantial support for the notion that Mexican authorities employed torture in the course of investigating the alleged kidnaping.[58]  The strength of the evidence is weak compared with that adduced in other cases, such as *Singh*, where petitioner proffered the affidavits of individuals who witnessed the torture.  *Singh*, 170 F. Supp. 2d at 1029.

One category of evidence is somewhat different, however.  Munoz proffered evidence that Rosas's purported lawyer, a Mr. Bereshit, may have colluded with the government to induce Rosas sign an incriminating statement.[59]  The evidence consists primarily of summaries of court proceedings

---

[56]Amended Petition, Exhs. 13, 44-55.  Munoz also proffered two statements he submitted to Mexican courts; these are Exhibits 12 and 14 to his amended petition.  The statements are not evidence of torture; instead, they are relevant to establish an alibi defense and thus contradict the government's facts.  These statements were correctly excluded, as they do not explain the government's evidence in any way.

[57]Extradition Order at 37-38.

[58]Although of uncertain applicability in this context, this conclusion also comports with Ninth Circuit precedent holding that the erroneous exclusion of evidence does not necessarily require reversal.  See *Obrey v. Johnson*, 400 F.3d 691, 699-701 (9th Cir. 2005) ("[W]hen reviewing the effect of erroneous evidentiary rulings, we will begin with a presumption of prejudice.  That presumption can be rebutted by a showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted."); *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983).

[59]As support for this contention, Munoz relies in part on one of Rosas's recantations, which discussed his purported contact with Bereshit, who is identified as "Daniel" in the statement.

at which Bereshit and Rosas's family members testified concerning Bereshit's relationship with Rosas and whether Bereshit had entered into some form of attorney-client relationship with Rosas.[60] Munoz also proffered court documents and letters from government agencies suggesting that Bereshit represented that he was an attorney, despite not being registered to practice law.[61] Finally, Bereshit's name appears on other court documents as an "assistant" to the prosecutor in the kidnaping case against Munoz and Rosas.[62]

As some of this evidence does not concern Rosas's recantations, but the manner in which his inculpatory statement was procured, it may be admissible. Even if considered, however, the evidence is inconclusive, consisting as it does of conflicting factual statements by Bereshit and various witnesses. To evaluate the evidence, the extradition court would have to assess these conflicts, make credibility determinations based on the papers, and choose which account of events to believe. Cf. *Quinn*, 783 F.2d at 815 ("The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense. And on review we can determine only whether, because of an absence of competent evidence, the magistrate's determination is wrong as a matter of law."); cf. also *Collins*, 259 U.S. at 316 ("It is clear that the mere wrongful exclusion of specific pieces of evidence, however important, does not render the detention illegal"). Even were the extradition court able to engage in such an analysis, the most the evidence does is raise questions as to whether Bereshit attempted improperly to influence Rosas in some manner. Given the other evidence the government has put forward (including Hurtado's statement), this evidence, if considered, would not undermine the government's probable cause showing.

Having therefore determined that competent evidence exists to support the extradition court's probable cause determination, the court cannot say that consideration of any of this evidence would have altered the extradition court's probable cause finding.

C.    Whether Munoz's CAT Claim is Cognizable in This Habeas Proceeding

---

(Amended Petition, Exh. 11 at 5.) As the court has concluded that the extradition court properly excluded recantation evidence, the court does not address Rosas's statements concerning his alleged relationship with Bereshit.

[60]Amended Petition, Exhs. 32-34, 36.

[61]*Id.*, Exhs. 37-39.

[62]*Id.*, Exhs. 40. Munoz also proffers evidence that Bereshit was once convicted of robbery, property damage and fraud, and was imprisoned for approximately eight years. (*Id.*, Exh. 41.) This evidence does not concern Bereshit's contact with Rosas, or any other relevant subject. To the extent it is offered to impeach Bereshit or undermine his credibility, the extradition court cannot, as noted above, make credibility determinations.

24

Given the court's conclusion above, it need not address the parties' arguments regarding Munoz's CAT claim.  Nonetheless, the court offers some brief observations.

Although the government asserts that the court lacks jurisdiction to hear Munoz's CAT claim in this habeas proceeding, neither that issue nor Munoz's CAT claim is yet ripe.  After the extradition court certifies the individual's extraditability and habeas review of that order has concluded, "the Secretary acts in her discretion to determine whether the person will be surrendered, via extradition warrant, to the custody of the requesting state."  *Cornejo-Barreto I*, 218 F.3d at 1010 (citing 18 U.S.C. § 3186).  At that point, and only at that point, may an individual challenge the Secretary's surrender decision through an Administrative Procedures Act challenge to the executive's action.  *Id.* at 1012-13.  Consequently, Munoz's CAT claim is not ripe until until the extradition court considers the evidence discussed above, certifies Munoz's extradibility once again, if it does, habeas review of such an order has concluded, and the Secretary has issued a surrender order.

Once the Secretary determines to surrender Munoz, if she does, the scope of judicial review of Munoz-Santos's CAT claim will be limited as described in the Ninth Circuit's recent en banc decision in *Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012).  In a per curiam opinion, the Ninth Circuit concluded that while a habeas court can properly exercise jurisdiction over a CAT claim raised in a habeas petition challenging an extradition order, the scope of the court's review is narrowly proscribed.  *Id.* at 955-56.  After the Secretary of State has decided to surrender the petitioner, the Ninth Circuit stated, a habeas court can only review whether, in determining to surrender a fugitive to a foreign country, she complied with her "clear and nondiscretionary duty pursuant to the implementing regulations to consider whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition. . . ."  *Id.* at 960-61 (citing 22 C.F.R. § 95.2.).  The court is prohibited from "inquiring into the merits of the Secretary's extradition decision."  *Id.*

Stated differently, the habeas court can only "determin[e whether] the Secretary has complied with the law . . . [by] requir[ing] submission to the court of a certification or affidavit from the Secretary or her authorized designee certifying compliance with the non-discretionary obligations imposed by statute and regulation."  *Id.* at 961.  After the Secretary makes the submission and it is deemed sufficient by the court, any review of the CAT claim would be at an end.

Because the Secretary has not yet determined whether to surrender Munoz, and has not been required to submit an affidavit certifying her compliance with the requirements of CAT, Munoz's CAT claim is not ripe.  If and when the Secretary makes such a determination, and submits an acceptable affidavit, however, the court will be unable to admit and consider evidence regarding the possibility that Munoz may be tortured in Mexico, because it cannot question the wisdom of the Secretary's decision.  Rather, it can review only whether the Secretary made her decision after considering the likelihood that Munoz would be tortured.  Thus, Munoz's request that the court review the merits of his CAT claim fails.

25

## III. CONCLUSION

For the reasons stated, the court denies Munoz's petition.

CALLAHAN, Circuit Judge, with whom IKUTA, Circuit Judge, joins, dissenting:

The question in this habeas case is straight-forward: Under the federal extradition statute, 18 U.S.C. §§ 3181–3195, and the terms of the extradition treaty between the United States ("Government") and Mexico, did the extradition judge err in excluding evidence that contradicts the Mexican government's evidence of probable cause to believe that Jose Luis Munoz Santos ("petitioner"), a fugitive of Mexico, is guilty of kidnapping in Mexico? The majority answers with a resounding "yes," overturning more than a century's worth of extradition jurisprudence. It first reviews the extradition court's decision for technical error, exceeding the scope of judicial review under well-established Supreme Court precedent. Second, despite its protestations to the contrary, the majority risks converting a probable cause hearing into a mini-trial with all the evidentiary trappings, again contrary to Supreme Court precedent. Moreover, by requiring extradition judges to consider and weigh evidence that a fugitive raises in defense of the criminal charge he faces abroad, the reliability of the foreign nation's evidence is put to the test on American soil. Under the governing treaty, however, and consistent with controlling precedent, this assessment is reserved for the Mexican judicial authorities, not U.S. courts.

Extradition judges are not judicial Transformers; they are not trial judges in disguise. Congress has never deputized extradition judges for this purpose, nor has it vested Article III judges with the power to expand the limited role these judicial officers serve in the realm of foreign relations. The majority's approach violates the terms of the governing treaty and the statutory framework established by Congress. The

approach also interferes with the diplomatic relationship that the Executive and Legislative branches have established with Mexico. Because the Judiciary is not authorized to drive a wedge in that relationship, I dissent.

## I.     Background

Mexican authorities have charged the petitioner with kidnapping Dignora Hermosillo Garcia ("Hermosillo") and her four- and six-year-old daughters for ransom in August 2005.[1]  Kidnapping is an extraditable offense under the extradition treaty between the United States and Mexico. Extradition Treaty Between the United States of America and the United Mexican States, Mex.-U.S., May 4, 1978, 31 U.S.T. 5059 [hereinafter "Extradition Treaty" or "Treaty"].[2] On August 15, 2006, Mexico requested the petitioner's extradition by formal request, and a United States Magistrate Judge of the Central District of California held a hearing to determine his extraditability.  On behalf of Mexico, the United States submitted witness statements from the victims and confessions from the petitioner's co-conspirators:

> (1)  Hermosillo described the kidnapping and identified Fausto Librado Rosas Alfaro ("Rosas") as the armed, masked man who abducted her and her daughters from their

---

[1] Hermosillo's younger daughter died during the course of the kidnapping.  Mexico initially charged the petitioner with kidnapping and homicide, but the charge was ultimately reduced to kidnapping alone.

[2] The Treaty was signed and ratified by President Jimmy Carter with the consent of the Senate, and entered into force on January 25, 1980.

home and tied them up (August 29, 2005 and November 7, 2005);

(2) Roberto Castellanos Meza ("Castellanos"), Hermosillo's husband and the father of the abducted children, described events that transpired before and after the kidnapping (August 21, 2005);

(3) Benigno Andrade Hernandez ("Andrade") voluntarily appeared before a prosecutor and incriminated himself, Munoz and Rosas in a sworn statement, and identified both in photographs (January 12, 2006);

(4) Jesus Servando Hurtado Osuna ("Hurtado"), a co-conspirator, received assistance from a public defender and incriminated himself, Munoz, Rosas and two other individuals, admitting their involvement both in planning and executing the kidnapping (March 14, 2006); and

(5) Rosas, a co-conspirator, appeared before a criminal court judge and implicated himself, Hurtado and Munoz, and corroborated Hurtado's version of events (signed March 27, 2006).

*In re Extradition of Santos*, 795 F. Supp. 2d 966, 972–79 (C.D. Cal. 2011).

The statements were made to Mexican law enforcement or to the Mexican judiciary and properly authenticated, a fact the petitioner does not contest.  Specifically,

> [t]hat evidence was contained in various filings accompanied by certificates with ribbons and seals signed by the then-current principal consular officer, the "Minister Counselor of Consular Affairs" of the United States at Mexico City, Mexico, attesting that the annexed documents were "properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of the United Mexican States."

*Id.* at 971 (record citations omitted).

Based on the Government's presentation, the extradition judge found probable cause to believe that the petitioner was guilty of the alleged kidnapping and, accordingly, certified his extradition.  In reaching this conclusion, the judge excluded statements from the co-conspirators recanting their prior confessions, which they alleged were obtained through torture.[3]  The Mexican government disputed these allegations

---

[3] It appears that the extradition judge also excluded "voluminous additional evidence" offered to "enhance the reliability" of the recantations and allegations of torture and coercion. *Extradition of Santos*, 795 F. Supp. 2d at 988, 990 ("Munoz's evidence offered to show that the inculpatory statements relied on by the government to establish probable cause were recanted and were procured through torture or coercion is inadmissible and has not been considered in determining probable cause.").  As stated by that court:

with an affidavit from a Mexican prosecutor attesting to Hurtado's and Rosas's detention in Mexico, the failure of either conspirator to file a formal complaint with Mexican authorities that they had been tortured, and the results of medical and psychological examinations conducted of both individuals on March 21–22, 2006, which revealed no evidence of bodily injury or mental disorder.[4]

## II.    Standard of Review

"[A] habeas petition is the only available avenue to challenge an extradition order," and the scope of review is

---

> The additional evidence includes, but is not limited to: (1) additional declarations by Munoz, Hurtado, and other witnesses who had some connection to Munoz or his co-defendants in the criminal case in Mexico; (2) newspaper articles identifying Hermosillo's husband's brother as a suspected drug dealer who reportedly attacked Mexican soldiers; (3) copies of reports of forensic medical examinations of Munoz; (4) bank records, hotel records, Western Union records, and similar evidence offered to establish alibi defenses by Munoz or his co-defendants; (5) Mexican court documents showing that an appeals court reversed the kidnapping conviction of Lopez Mendivil, acquitted her, and ordered her immediate release from custody; and (6) reports on human rights practices in Mexico prepared by the U.S. Department of State, Bureau of Democracy, Rights, and Labor.

*Id.* at 988.

[4] Curiously, in their initial recantations, both Hurtado and Rosas stated that they were tortured sometime between March 19 and March 22, 2006, the precise time-frame during which they were medically examined. They adjusted this time-line in later amendments to their statements.

severely limited. *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006); *see* 28 U.S.C. § 2241. An error in declining to consider evidence at an extradition hearing is not a basis for habeas relief. Long ago Justice Brandeis, speaking on behalf of a unanimous Supreme Court, made it abundantly clear that the "mere wrongful exclusion of specific pieces of evidence, however important, does not render [an extradition] detention illegal." *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *see Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (Holmes, J.); *Collins v. Miller*, 252 U.S. 364, 369 (1920) (Brandeis, J.); *Charlton v. Kelly*, 229 U.S. 447, 461 (1913). When the magistrate in *Charlton* excluded the fugitive's "impressive evidence of insanity," for example, the Supreme Court rejected the fugitive's claim of reversible error because the alleged error was beyond the scope of habeas relief. 229 U.S. at 457–58, 461–62.

The Supreme Court has not created any exception to this rule. Habeas review is limited to "[1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and, [3] by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez*, 268 U.S. at 312 (emphasis added). The third factor—the only factor at issue here—requires the court to determine "whether, *under the construction of the act of [C]ongress and the treaty entered into between this country and Mexico*, there was legal evidence before the [extradition judge] to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government."[5]

---

[5] At the extradition hearing, counsel for the petitioner stipulated that all elements, except the element of probable cause, had been satisfied. *Id.* at 970.

*Benson v. McMahon*, 127 U.S. 457, 463 (1888) (emphasis added).

This express limitation reflects the principle that the existence of foreign criminal proceedings, which we must accept as adequate for purposes of extradition, will give the fugitive ample process to develop his claims of innocence. *See Fernandez*, 268 U.S. at 312; *Glucksman v. Henkel*, 221 U.S. 508, 512 (1911) (Holmes, J.). Unlike a habeas petition from a criminal conviction, a habeas petition in the extradition context is not the end of the line; rather, it is only a preliminary step designed to allow the criminal process to continue and be completed in the country with jurisdiction over the charged crime.

The majority, in essence, disregards this longstanding precedent. Although it acknowledges that a judge sitting as an extradition court must "consider whether the evidence is 'sufficient to sustain the charge under the provisions of the proper treaty or convention,'" Maj. Op. 28 (quoting 18 U.S.C. § 3184), this acknowledgment is just a token reference to 18 U.S.C. § 3184. That's the last time either the Treaty or the statute appears in the opinion. The majority's approach departs from the example set by the Supreme Court confining its review of an extradition order to strict applications of the extradition statute and the relevant treaty. In setting its preferred standard of review, the majority loses sight of the paramount inquiry of any extradition application: whether probable cause exists to believe that the fugitive committed the crimes charged in the requesting country. The majority's approach allows it to make determinations reserved for the Mexican legal system. This is a clear violation of principles of international comity and separation of powers.

## III.    Extradition Framework

Courts play a narrowly defined role in the extradition process.  The process begins with the decision of the political branches to enter into an extradition treaty, a decision that rests on those branches' determination that the foreign country's legal and penal system is one into which the United States is willing to extradite fugitives.  By statute, courts play an important role in determining whether an individual is eligible to be extradited under the terms of the applicable treaty, but that role is limited, as courts have long recognized.

For example, an extradition judge may not deny extradition on the ground that the requesting country will not provide a fugitive the procedures and rights available in an American criminal court, even if those rights are guaranteed under our Federal Constitution.  *Neely v. Henkel*, 180 U.S. 109, 122–23 (1901).  Nor may a judge entertain challenges that a requesting country has not followed its own laws in bringing a criminal case or extradition request.  *See Skaftouros v. United States*, 667 F.3d 144, 155–56 (2d Cir. 2011) (principles of international comity and judicial modesty restrain extradition courts from deciding most questions of foreign law and procedure).  Unanimously, in *Munaf v. Green*, the Supreme Court even refused to review claims that a fugitive would be subject to torture or other inhumane treatment if surrendered.  553 U.S. 674, 700–02 (2008) (Roberts, C. J.); *see Trinidad y Garcia v. Thomas*, 683 F.3d 952, 978 (9th Cir. 2012) ("[C]ourts in this country refrain from examining the penal systems of requesting nations,

leaving to the Secretary of State determinations of whether the defendant is likely to be treated humanely.").[6]

To the extent that the alleged denial of constitutional rights should affect the willingness of the United States to extradite, the Supreme Court has held that "it is for the political branches, not the Judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." *Munaf*, 553 U.S. at 700–01. In particular, the Court has emphasized:

> The Judiciary is not suited to second-guess such determinations—determinations that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area. *See* The Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations[.]"). In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious

---

[6] In *Munaf*, the Supreme Court noted that "the Solicitor General state[d] that it is the policy of the United States not to transfer an individual in circumstances where torture is likely to result." 553 U.S. at 702. Although the prospect of future torture is not the subject of this appeal, it is worth noting that the petitioner raised this claim on his own behalf to the extradition court. There, he argued that his extradition should be denied under the United Nations Convention Against Torture "'[g]iven the record of torture and death threats' in this case," and because "'it is extremely likely that [he] and his family will be subjected to grievous harm' in the form of torture, threats, and even assassination if he were returned to Mexico." *Extradition of Santos*, 795 F. Supp. 2d at 990.

> prospect of torture at the hands of an ally, and
> what to do about it if there is.

*Id.* at 702; *see Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity upon which extradition is based." (citing *Factor v. Laubenheimer*, 290 U.S. 276 (1933)). In effect, U.S. courts "are bound by the existence of an extradition treaty to assume that the [foreign] trial will be fair." *Glucksman*, 221 U.S. at 512. Here, the Treaty requires us to accept that Mexico's judiciary will fairly evaluate the proffered evidence of torture should the petitioner choose to raise such evidence in defense of the kidnapping charge he faces there.

Because the political branches have plenary authority to accept the fairness of a foreign country's legal system, it makes sense that the final decision to extradite rests with them. As defined by Congress, the Executive remains primarily responsible for extradition while the extradition judge is assigned the limited duty of determining the sufficiency of the request under the applicable treaty provisions. 18 U.S.C. § 3184; *see Martin v. Warden*, 993 F.2d 824, 828–29 (11th Cir. 1993); *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997) ("Extradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that [a] statute interposes a judicial function."). That judicial function is carried out by conducting a hearing pursuant to § 3184 and, if the request is supported by sufficient evidence, certifying the foreign country's request to the Secretary of State. The Secretary of State is not required to grant extradition but may,

in his or her discretion, decline extradition for reasons that are not available to the courts or grant extradition subject to conditions.  *See* 18 U.S.C. §§ 3184, 3186.  This division of responsibility between the courts and the Executive branch reflects "institutional competence rationales and our constitutional structure, which places primary responsibility for foreign affairs in the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

## IV.    The Extradition Hearing

The extradition process reflects these fundamental differences in institutional competence and separation of powers principles. In *Benson*, the Supreme Court stated that an extradition hearing is a limited affair akin to a preliminary hearing to determine whether to hold an accused to answer for the commission of a crime.  127 U.S. at 463.  "That explanation . . . is no less persuasive today."  *Ward v. Rutherford*, 921 F.2d 286, 288 (D.C. Cir. 1990) (Ginsburg, J.) (discussing *Benson* and citing *Hooker v. Klein*, 573 F.2d 1360, 1367 (9th Cir. 1978), *cert. denied*, 439 U.S. 932 (1978)).  The Supreme Court has also likened an extradition proceeding to a grand jury investigation, where the procedural rights of the accused are limited.  *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (no right to cross-examine government affiants at extradition hearings); *Charlton*, 229 U.S. at 459–62 (analogizing extradition proceedings to grand jury proceedings).  We embraced this understanding in *Barapind v. Enomoto* when we held that an extraditee has no right to introduce contradictory or impeaching evidence.  400 F.3d 744, 750 (9th Cir. 2005) (en banc).  Because an extradition hearing is *not* a plenary trial at which guilt or innocence is decided, the Supreme Court has derided attempts to import trial-type procedural requirements into the

proceeding.  *Fernandez*, 268 U.S. at 312; *Glucksman*, 221 U.S. at 512 ("It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law.  But it is a waste of time.").

## A.  Role of the Extradition Judge

We have previously stated that extradition judges "conduct a circumscribed inquiry in extradition cases." *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003).  Their role is defined by statute as well as by the relevant extradition treaty.  18 U.S.C. §§ 3181–3195*; see id.* § 3181(a) ("The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government.").   The extradition judge is authorized only to "determine whether there is competent evidence to justify holding the accused to await trial." *Collins*, 259 U.S. at 316.  (As explained below, "competent evidence" is simply any evidence that has been certified in accordance with the extradition statute.)   In making this assessment, the extradition judge does not weigh conflicting evidence presented by the fugitive or make credibility determinations based on that evidence. *Barapind*, 400 F.3d at 749–50.   To the extent that an extradition judge is authorized to assess the credibility and reliability of the Government's evidence, he or she does so based on an examination of that evidence under the terms of the governing treaty.   Upon a showing of sufficiency, the inquiring magistrate judge is required to certify the fugitive as extraditable to the Secretary of State and to issue a warrant. 18 U.S.C. § 3184.

## B.  Probable Cause Standard of Proof

The Government (on behalf of the requesting country) bears the burden of submitting evidence that is "sufficient to sustain the charge [of criminality] under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  Extradition treaties, unlike criminal statutes, "should be liberally construed as to effect the apparent intention of the parties"—i.e., in favor of enforcement—as they are brokered "in the interest of justice and friendly relationships."  *Factor*, 290 U.S. at 293, 298.  Courts are bound by this principle to "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories."  *Kin-Hong*, 110 F.3d at 110 (quoting *In re Extradition of Howard*, 996 F.3d 1320, 1330–31 (1st Cir. 1993)); *accord Factor*, 290 U.S. at 293–94.

Here, the Treaty requires that evidence be "sufficient, according to [United States] laws . . . to justify the committal for trial of the person sought."  Treaty, art. 3.  The Treaty further provides that

> [w]hen the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by . . . *[e]vidence which*, in accordance with the laws of the [United States], *would justify apprehension and commitment for trial* of the person sought if the offense had been committed there.

*Id.*, art. 10(3)(b) (emphasis added).

The standard of proof set forth in § 3190 and the Treaty allows for nothing more than an inquiry into whether

probable cause exists to believe that the fugitive committed the alleged crimes.  Probable cause exists when, under the "totality of the circumstances known to the [Government], a prudent person [knowing those facts] would have concluded that there was a fair probability that [the accused] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *see Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).

In the context of evaluating the sufficiency of a criminal complaint, the Supreme Court framed the probable cause inquiry as simply:  "What makes you think that the defendant committed the offense charged?"  *Jaben v. United States*, 381 U.S. 214, 224 (1965).  This question, the Court explained,

> does not reflect a requirement that the Commissioner ignore the credibility of the complaining witness.  There is a difference between disbelieving the affiant and requiring him to indicate some basis for his allegations. Obviously any reliance upon factual allegations necessarily entails some degree of reliance upon the credibility of the source. Nor does it indicate that each factual allegation which the affiant puts forth must be independently documented, or that each and every fact which contributed to his conclusions be spelled out in the complaint. It simply requires that enough information be presented to the Commissioner to enable him to make the judgment that the charges are not capricious and are sufficiently supported to

justify bringing into play the further steps of
the criminal process.

*Id.* at 224–25 (internal citations omitted).

Here, the Government has answered the question—"What makes you think that the fugitive committed the offense charged?"—with affidavits from Hermosillo and her husband (Castellanos), from whom the ransom was extorted; authenticated confessions from Rosas and Hurtado, two co-conspirators to the kidnapping who fingered the petitioner as the mastermind behind the abduction plan; an affidavit from Andrade, who identified the petitioner and Rosas in photographs as the men who approached him approximately one month before the kidnapping to ask if he was interested in "pulling a 'job' . . . . to ask 'Beto' [Hermosillo's husband] for two million pesos"; and an affidavit from a prosecutor from Mexico rebutting the allegations of torture. *Extradition of Santos*, 795 F. Supp.2d at 972–79 & n.8.

The extradition court was not simply authorized to admit this evidence; it was obligated to do so under the Treaty. Treaty, art. 10(6)(b) ("The documents which, according to this Article, shall accompany the request for extradition, shall be received in evidence when . . . they are certified by the principle diplomatic or consular officer of the Untied States in Mexico."). It's hard to imagine what more the Government would have to submit to satisfy the low threshold of probable cause.

## C. Admissibility of Evidence

"The special and limited nature of extradition hearings is manifested in a more lenient standard for admissibility of

evidence." *Kin-Hong*, 110 F.3d at 120. The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply in the extradition context. Fed. R. Crim. P. 1(a)(5) (rules are not applicable to the "extradition and rendition of a fugitive"); Fed. R. Evid. 1101(d)(3) (same). Admissibility is instead controlled by § 3190.[7] Under that statute,

> [d]epositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so

---

[7] Citing the predecessor statute to 18 U.S.C. § 3190, which mandates the admission of a requesting country's supporting documents if they have been certified through diplomatic channels, the Supreme Court in *Bingham* explained:

> It is one of the objects of § 5170 [today, § 3190] to obviate the necessity of confronting the accused with the witnesses against him; and a construction of this section, or of the treaty, that would require the demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty.

241 U.S. at 517; *see Yordi v. Nolte*, 215 U.S. 227, 231 (1909).

offered, are authenticated in the manner required.

18 U.S.C. § 3190. Correspondingly, the Treaty provides that documents submitted in support of extradition "shall be received in evidence when . . . certified by the principle diplomatic or consular officer of the United States in Mexico." Treaty, art. 10(6)(b).

Unless the relevant treaty provides otherwise, the only requirement for admitting evidence is that the evidence be authenticated. *Manta v. Chertoff*, 518 F.3d 1134, 1146 (9th Cir. 2008); *see Man-Seok Choe v. Torres*, 525 F.3d 733, 740 (9th Cir. 2008); *Oen Yin Choy v. Robinson*, 858 F.2d 1400, 1406 (9th Cir. 1988) ("We have indicated that authentication is the only requirement for admissibility of evidence under general United States extradition law." (citing *Emami v. United States Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1451 (9th Cir. 1987)). Thus, "competent evidence to justify holding the accused to await trial," *Collins*, 259 U.S. at 316, is simply any evidence that has been certified in accordance with the extradition statute. The documents submitted by the Government comport with the requirements of § 3190. It bears repeating that the petitioner does not challenge the authentication of any of the Government's documentation. The extradition judge was obligated to receive this evidence and assess whether the evidence adequately established probable cause. Upon receiving and examining the Government's authenticated evidence, the

magistrate determined that probable cause was established to hold the petitioner.**[8]**

Until today, we have rejected invitations to impose any additional requirement for admitting documentary evidence in an extradition proceeding. *Barapind*, 400 F.3d at 748. In *Barapind*, we stated:

> [I]t is undisputed that the evidence presented against Barapind was properly authenticated pursuant to section 3190, and the Treaty itself contains no supplementary authentication requirements. We therefore reject Barapind's claim that the extradition court erred in relying upon the authenticated documentary evidence submitted by India.

*Id*. Today, the majority recants these principled statements. The majority now requires that authenticated evidence must also satisfy the Fifth Amendment's Due Process Clause. Maj. Op. 33–35. The majority's rationale conflicts with Supreme Court precedent holding that the right to extradite arises from—and only from—the treaty that created it. *Factor*, 290 U.S. at 287.

---

**[8]** Although authenticated evidence is admissible, admissibility by itself is not the test for probable cause. In cases where the Government's evidence has been authenticated and admitted but nevertheless fails to satisfy probable cause, an extradition judge may not certify extradition. This is not one of those cases, however.

## D. Limited Rights of the Fugitive

Because of the limited purpose of an extradition hearing and the comity owed other nations under an extradition treaty, a fugitive's ability to present evidence is limited. In *Loisel*, the Supreme Court held that a fugitive does not have a broad right to present evidence at an extradition hearing. 259 U.S. at 315–17. The Court reasoned:

> If [the right to introduce evidence in defense of the charged crime] were recognized as the legal right of the accused in extradition proceedings, it would give him the option of insisting upon a full hearing and trial of his case here; and that might compel the demanding government to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government though entitled by the terms of the treaty to the extradition of the accused for the purpose of a trial where the crime was committed, would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here. This would be in plain contravention of the intent and meaning of the extradition treaties.

*Id.* at 316 (quoting *In re Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *see also Charlton*, 229 U.S. at 461. The Court further explained that evidence offered to "contradict" the

government's evidence was not properly admitted under this standard. *Collins*, 259 U.S. at 316.

For that reason, evidence that "goes to guilt or innocence or tends to contradict the requesting party's case"—i.e., evidence that would lead to a material dispute over the truthfulness of proffered evidence—has been held to be inadmissible at an extradition hearing. *Hooker*, 573 F.2d at 1368; *Barapind*, 400 F.3d at 749–50; *Desmond v. Eggers*, 18 F.2d 503, 505 (9th Cir. 1927) ("All of the authorities agree . . . that matters which are only a defense to a trial on the merits are not admissible."); *In re Extradition of Zhenly Ye Gon*, 613 F. Supp. 2d 92, 102 (D.D.C. 2009).

While a fugitive may introduce evidence explaining the evidence submitted by the requesting country, *Barapind*, 400 F.3d at 749, "explanatory" evidence has a narrow meaning in an extradition proceeding. "Explanatory" evidence is undisputed evidence that essentially accepts the substance of the requesting country's evidence as true, but casts the requesting country's evidence in a light that, although innocent, negates or "obliterates" the inference of guilt. *See id.*; *see also Extradition of Glantz*, No. 94 Crim. Misc. 1 P. 25, 1995 WL 495644, at *13 (S.D.N.Y. Aug. 21, 1995) (fugitive is "limited to attempting to offer a benign explanation of the evidence presented against him"); *In re Ezeta*, 62 F. 972, 986 (N.D. Cal. 1894) ("explanatory" evidence "does not contradict or impugn testimony [submitted by] the prosecution"); Jacques Semmelman, *The Rule of Non-Contradiction in International Extradition Proceedings: A Proposed Approach to the Admission of Exculpatory Evidence*, 23 Fordham Int'l L.J. 1295, 1297 (2000) (describing "explanatory" evidence as evidence that

"provides an innocent explanation for events that the government contends point toward guilt").

The Government offers a useful hypothetical example of "explanatory" evidence:

> A requesting country seeks extradition based solely on an eyewitness account of an apparent homicide at a train station. The requesting country proffers an eyewitness account, in which the witness reported standing near the train tracks and seeing two men farther down the train platform arguing with one another, and heard one man threaten to harm the other. As the train approached the platform, the witness turned away from the men for a moment, and when he turned back, he saw the man who had been threatened on the train tracks, where he was immediately struck by the train and killed. The requesting country inferred from the eyewitness account that the second man had pushed the victim onto the train tracks and charged the second man with murder. The accused man located security video footage of the train tracks (the authenticity of which was not disputed by the requesting country) and the video clearly showed that in the moment the witness looked away, the victim jumped onto the train tracks without any contact from the accused. *Critically, the introduction of the uncontested security video would require no fact-finding, would not invite weighing of evidence, and*

*would negate the only evidence of probable
cause.*

Government's Answering Brief at 34, *Santos v. Thomas*, No.
12-56506 (9th Cir. Dec. 23, 2013) (emphasis added).

An extradition hearing cannot serve the purpose for which
it was created if we require extradition judges to resolve
evidentiary disputes. We have stated that "[t]he very purpose
of extradition treaties is to obviate the necessity of
confronting the accused with witnesses against him."
*Mainero v. Gregg*, 164 F.3d 1199, 1206 (9th Cir. 1999).
Requiring extradition judges to resolve evidentiary disputes
would undermine this objective since rebutting a fugitive's
evidentiary challenge would necessitate that the requesting
country send its evidence and witnesses to the United States
to be (improperly) tested.  As the Supreme Court has
explained, the very point of extradition treaties would be
defeated were the requesting country forced to bear this
burden. *Bingham*, 241 U.S. at 517; *see Benson*, 127 U.S. at
463 ("We are not sitting in this court on the trial of the
prisoner, with power to pronounce him guilty and punish him
or declare him innocent and acquit him."). It is this
foreseeable burden that animates the distinction between
"contradictory" evidence and "explanatory" evidence.

In this case, the petitioner sought to admit self-serving
statements by Hurtado and Rosas that recant their prior
confessions inculpating the petitioner for kidnapping. The
disputed recantations are "contradictory," as even the
majority admits.  Maj. Op. 32.  The majority labors to
surgically detach the assertions of torture from the recanted
assertions contained in the very same documents. Maj. Op.
32–35. The assertions of torture, the majority contends, are

"explanatory" rather than "contradictory" evidence because they suggest that a due process violation has occurred. The characterization is flawed, and the operation a failure, for multiple reasons.

The majority assumes that due process afforded at an extradition proceeding is the same due process afforded at a criminal trial, but this is not true. The Supreme Court has likened an extradition proceeding to a grand jury investigation into the existence of probable cause. *See Bingham*, 241 U.S. at 517; *Charlton*, 229 U.S. at 459–62. It is well settled that the target of a grand jury investigation has no right to present any evidence to the grand jury, even if that evidence would completely undermine the government's evidence. The defendant in an extradition hearing, however, may present "explanatory" evidence, but only "explanatory" evidence. Anything more forces an extradition judge to conduct a mini-trial into the probative value of the proffered evidence—the very procedure disapproved by the Supreme Court.

Moreover, the Supreme Court has held that a number of Constitutional rights are not cognizable in extradition hearings. For example, while it violates due process to try a person who is so mentally incompetent that he cannot assist with his defense, the Supreme Court in *Charlton* held that a fugitive had no right to introduce evidence of insanity at his extradition hearing. 229 U.S. at 462. Similarly, due process may protect a criminal defendant from excessive pre-accusation delay by the prosecution, *e.g.*, *United States v. Lovasco*, 431 U.S. 783, 788–89 (1977), but we have held that "the [U.S.] Constitution does not of its own force impose on foreign governments the obligation to act speedily in seeking extradition of a fugitive from the United States," *In re*

*Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986) (no constitutional or treaty violation simply because extradition was requested five years after offense occurred).[9] Thus, contrary to the majority's assumption, the Judiciary has no obligation to ensure that an extradition request or evidence submitted to show probable cause does not violate our Constitution. Its obligation is to ensure that an extradition request does not violate the extradition statute or the governing treaty.

Critically, labeling the proffered evidence as going to the "competence of the government's evidence" does not, as the majority suggests, magically or otherwise make the evidence "explanatory" rather than "contradictory." Maj. Op. 32–33. The litmus test is whether, as a practical matter, the admission of the evidence will result in a mini-trial. *Collins*, 259 U.S. at 315–16; *Charlton*, 229 U.S. at 460–62; *Benson*, 127 U.S. at 463; *Barapind*, 400 F.3d at 749–50. If the evidence would compel such a trial, the evidence is "contradictory." Here, the majority contends that the extradition judge must consider the petitioner's evidence, even though it contradicts Mexico's medical evidence showing the absence of physical injuries shortly after the

---

[9] *See also Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) (14-year delay between crime and extradition request did not violate due process); *Martin*, 993 F.2d at 825 (17-year delay in bringing extradition request did not bar extradition; neither treaty nor due process afforded right to speedy extradition); *In re Burt*, 737 F.2d 1477, 1482, 1486–87 (7th Cir. 1984) (no violation of due process to extradite fugitive even though extradition request was made 16 years after commission of crime); *Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir. 1984) (due process protections not applicable and did not bar extradition where Australia sought extradition eight years after crime occurred).

torture allegedly occurred.[10] Once the extradition judge "considers" the allegations of duress, Mexico will likely feel obligated to "produce all its evidence here, both direct and rebutting, in order to meet the [allegations]." *Collins*, 259 U.S. at 316. As forewarned by the Supreme Court, "[t]he result would be that the foreign government . . . would be compelled to go into a full trial" on the duress issue. *Id.* Indeed, an improper mini-trial is likely to result even if, as the majority holds in conclusory fashion, the extradition judge may certify extradition in cases where the allegations do not credibly allege torture on their face. Maj. Op. 41–42. Foreign governments seeking extradition are unlikely to let allegations of torture lie unanswered, and the credibility of conflicting evidence simply cannot be determined without a trial. The majority has not explained how, in this situation, a mini-trial could be avoided.

The majority, perhaps recognizing the impracticality of its approach, attempts to cabin its holding. It states:

> Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court's limited review, the court has fulfilled its obligation—as the extradition court did in *Barapind*.

---

[10] Lest we lose sight of the quantity of evidence facing the judge in this case, this evidence includes *all* of the additional volumes of documentary evidence proffered by the petitioner, but not raised on appeal, in supporting the allegations of torture. *Extradition of Santos*, 795 F. Supp. 2d at 988.

Maj. Op. 42. This distinction is illusory. Given the Government's evidence and the torture evidence proffered in this case, how could the extradition court determine the credibility of the evidence of torture without holding a mini-trial—in other words, "without exceeding the scope of an extradition court's limited review?"

Under the guidance of the Supreme Court, courts have attempted to draw a bright line between "explanatory" evidence and "contradictory" evidence. As explained above, the cases and supporting literature indicate that "explanatory" evidence is undisputed evidence that accepts the requesting country's evidence as true and casts such evidence in an innocent light while simultaneously negating the inference of guilt. *See Collins*, 259 U.S. at 315–16 (fugitive permitted to testify "to things which might have explained ambiguities or doubtful elements in the prima facie case made against him"—i.e., "evidence bearing upon the issue of probable cause"); *Barapind*, 400 F.3d at 749; *see also Extradition of Glantz*, 1995 WL 495644, at *13 (fugitive is "limited to attempting to offer a benign explanation of the evidence presented against him"); *Ezeta*, 62 F. at 986 ("explanatory" evidence "does not contradict or impugn testimony [submitted by] the prosecution"); Semmelman, *supra*, at 1297 ("explanatory" evidence is evidence that "provides an innocent explanation for events that the government contends point toward guilt").[11] Such evidence requires no fact-finding and would not invite the weighing of evidence.

---

[11] Failure to adhere to this narrow definition could yield unintended results. It is not clear what estoppel or preclusive effect an extradition judge's evidentiary ruling could have in the criminal courts of the requesting country.

Of course the deference that the requesting country enjoys does not mean that an extradition judge must accept unsubstantiated or otherwise insufficient allegations of criminality. *Giordenello v. United States*, 357 U.S. 480, 486 (1958).**[12]** "The improbability or the vagueness of the testimony [relied upon by the requesting country] may destroy the probability of guilt." *Shapiro v. Ferrandina*, 355 F. Supp. 563, 572 (S.D.N.Y. 1973). Likewise, probable cause may not exist where an accusation of criminality has been lodged for which there is insufficient evidence. *Man-Seok Choe*, 525 F.3d at 738. Where, as here, the accusation has been substantiated, probable cause may be defeated by showing that the evidence was not properly authenticated or by challenging its sufficiency on some other ground that does not involve the proffering of competing evidence tending to contradict the Government's evidence.

---

**[12]** Several courts have concluded that evidence proffered by the extraditing state should be deemed truthful by the extradition judge when assessing probable cause. *See In re Extradition of Atta*, 706 F. Supp. 1032, 1050–51 (E.D.N.Y. 1989) (noting that evidence contained in the extradition request "is deemed truthful for purposes of this determination" (citing *Loisel*, 259 U.S. at 315–16 )); *In re Solis*, 402 F. Supp. 2d at 1132; *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997); *Marzook v. Christopher*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) ("I must accept as true all of the statements and offers of proof by the demanding state."); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991). This view has been held to be consistent with the Supreme Court's approach in domestic extradition cases. *In re Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) (citing *California v. Superior Court of Cal., San Bernardino Cty.*, 482 U.S. 400, 409 (1987) ("If we accept as true every fact alleged, [the fugitives whose extradition from California was sought by Louisiana] are properly charged with kidnapping under Louisiana law. In our view, this ends the inquiry into the issue of whether or not a crime is charged for purposes of the Extradition Act [18 U.S.C. § 3182].")).

## V.     Deference to the Mexican Courts

In extradition proceedings, the responsibility for addressing proffered evidence of torture rests with the requesting country.  In recognition of this principle, Justice Holmes stated:  "[I]f there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose [a fugitive] guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender." *Glucksman*, 221 U.S. at 512.  Such deference arises from the comity shared between Treaty partners as well as case law acknowledging that the courts of the requesting country, having full access to the necessary evidence and witnesses, are better qualified than we are to consider the fugitive's allegations.  Where, at the behest of a foreign state, the Executive branch requests extradition, it is for the courts in the requesting country to determine whether law enforcement agents in that country have procured evidence improperly and, if so, whether any impropriety so taints the evidence that it should not be considered.

Consistent with the determination previously made by the Executive and Legislative branches, we must accept that the Mexican legal system can be relied on to adjudicate the petitioner's claims fairly. *See Spatola v. United States*, 741 F. Supp. 362, 371 (E.D.N.Y. 1990), *aff'd*, 925 F.2d 615 (2d Cir. 1991) ("[A] judicial proceeding in extradition is not the proper vehicle for challenging or questioning the fairness of another country's criminal justice system.").  Indeed, here the Mexican courts have already granted the petitioner relief on the homicide charge that was originally brought against him.

## VI.    Conclusion

"The principles of international law recognize no right to extradition apart from treaty." *Factor*, 290 U.S. at 287. "To determine the nature and extent of that right," therefore, "we must look to the treaty which created it." *Id*. The Extradition Treaty between the United States and Mexico has been in full force and effect since 1980. In it the nations have "agree[d] to mutually extradite, subject to the provisions of this Treaty, persons who the competent authorities of the requesting Party have charged with an offense." Treaty, art. 1. Our system of government demands that the Judiciary yield to this arrangement.

The record in this case consists of documentary evidence submitted by Mexico that comports with § 3190 and Article 10(6)(b). As such, the evidence meets the competency test and was properly admitted. The evidence established probable cause that the petitioner abducted Hermosillo and her two daughters for ransom in Mexico. When the extradition judge excluded the petitioner's competing evidence in defense, he did so consistent with his limited role under § 3184. Indeed, this ruling was compelled by the Supreme Court's longstanding extradition jurisprudence. *See Fernandez*, 268 U.S. at 312; *Collins*, 259 U.S. at 316; *Bingham*, 241 U.S. at 517; *Charlton*, 229 U.S. at 457–58, 461–62. The ruling cannot be overturned under the extradition statute or governing treaty, unless principles of statutory construction and international comity "are now to be discarded." *Factor*, 290 U.S. at 294; *cf. Ward*, 921 F.2d at 287 (citing plain meaning of § 3184 as justification for upholding "constitutionality of assigning extradition requests to a United States magistrate").

A defendant's ability to offer evidence in an extradition proceeding is limited to "explanatory" evidence. This is evidence that accepts the requesting country's evidence as true and casts the requesting country's evidence in an innocent light, while at the same time negating the inference of guilt. The test for determining whether the proffered evidence is "explanatory" or "contradictory" is whether its admission will require a mini-trial. *See Collins*, 259 U.S. at 315–16; *Charlton*, 229 U.S. at 460–62; *Benson*, 127 U.S. at 463; *Barapind*, 400 F.3d at 749–50. Here, there can be no doubt that the required admission of "contradictory" torture evidence demands a mini-trial. There is no other way of determining whether the authenticated statements were coerced as the petitioner contends, or whether they were voluntarily given, as Mexico asserts.

I am not immune from the "natural anxiety" the majority has in wanting to investigate the allegations of torture raised in this case. *Fernandez*, 268 U.S. at 312. But our concern does not justify abandoning the limited role we play in the extradition process. The extradition judge determines only whether the authenticated evidence establishes probable cause to believe the fugitive committed the crime, much like a grand jury returns an indictment, looking only at the evidence presented by the government. *See Bingham*, 241 U.S. at 517; *Charlton*, 229 U.S. at 459–62. Although allegations that the authenticated evidence was procured by torture can be troubling, in extradition proceedings we must trust the Executive branch and the judicial system of the requesting country to determine the veracity of such allegations and the attendant consequences. Because the majority would have the Judiciary convert extradition proceedings into mini-trials—contrary to the provisions of the Treaty, the extradition statute and Supreme Court precedent—I dissent.